# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 14, 2009      Decided January 12, 2010

No. 08-1379

MICHAEL FREDERICK SIEGEL,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

---

On Petition for Review of an Order
of the Securities & Exchange Commission

---

*George C. Freeman, III* argued the cause for petitioner. With him on the briefs was *Meredith A. Cunningham.*

*Rada Lynn Potts*, Senior Litigation Counsel, Securities and Exchange Commission, argued the cause for respondent. With her on the brief were *David M. Becker*, General Counsel, and *Jacob H. Stillman*, Solicitor.

Before: GARLAND, *Circuit Judge*, and EDWARDS and RANDOLPH, *Senior Circuit Judges.*

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This case involves a disciplinary action brought by the National Association of

Securities Dealers ("NASD")[*] against Michael Frederick Siegel ("Siegel"). From October 1997 to June 1999, Siegel worked as a registered, general securities representative with Rauscher Pierce Refsnes, Inc. ("Rauscher"), a NASD member firm. In 2002, NASD's Department of Enforcement filed a complaint with NASD's Office of Hearing Officers ("OHO") charging that, during his tenure with Rauscher, Siegel violated NASD Conduct Rules when four of his clients – Linda and Huntington Downer ("the Downers") and Dorothy and Barry Landry ("the Landrys") – invested in World Environmental Technologies, Inc. ("World ET"), a speculative, start-up company in search of financing. World ET eventually failed and the Downers and Landrys lost their investments. In its complaint, the Department of Enforcement alleged that Siegel violated NASD Conduct Rules 3040 and 2110 when he "sold away," *i.e.*, engaged in private securities transactions on behalf of his clients without providing prior written notice to Rauscher, and NASD Conduct Rules 2310 and 2110 when he recommended World ET to his clients without having any reasonable grounds for believing that his recommendations were suitable.

After a hearing, an OHO panel found that Siegel had engaged in the violations alleged. The panel imposed a six-month suspension and a $20,000 fine for the Rules 3040/2110 violations, and a six-month suspension and a $10,000 fine for the Rules 2310/2110 violations. The panel declined to impose restitution and the suspensions were to be served

---

[*] NASD was a national association of securities broker-dealers registered with the Securities and Exchange Commission ("SEC") under § 15A of the Exchange Act, 15 U.S.C. § 78o-3. In 2007, NASD changed its name to Financial Industry Regulatory Authority, Inc. ("FINRA"). *See* Securities Exchange Act Release No. 56,146 (July 26, 2007), 2007 SEC LEXIS 1641, at *9; *see also In re Michael Frederick Siegel*, Exchange Act Release No. 58,737 (Oct. 6, 2008), 2008 SEC LEXIS 2459, at *2 n.1, *reprinted in* 2 Joint Appendix ("J.A.") 678 n.1. Because the disciplinary action against Siegel was initiated in 2002, this opinion refers to "NASD," not "FINRA."

concurrently. *See Dep't of Enforcement v. Michael Frederick Siegel*, No. C05020055 (Apr. 19, 2004) ("*Initial OHO Decision*"), *reprinted in* 2 J.A. 463-79. The matter was appealed to NASD's National Adjudicatory Council ("NAC"). Following a remand to the OHO panel, *see In re Michael Frederick Siegel*, No. C05020055 (July 26, 2005) ("*Initial NAC Decision*"), *reprinted in* 2 J.A. 482-87, NAC affirmed the panel's initial findings, with two modifications. NAC ordered Siegel to serve his suspensions consecutively and ordered Siegel to pay restitution in the amounts of $300,300 to the Downers and $100,000 to the Landrys. *See In re Michael Frederick Siegel*, No. C05020055 (May 11, 2007) ("*Second NAC Decision*"), *reprinted in* 2 J.A. 497-521; *In re Michael Frederick Siegel*, No. C05020055 (Dec. 4, 2007) ("*NAC Supplemental Decision*"), *reprinted in* 2 J.A. 642-58. Siegel appealed to the SEC, which affirmed NAC's decision on all counts. *In re Michael Frederick Siegel*, Exchange Act Release No. 58,737 (Oct. 6, 2008) ("*SEC Decision*"), 2008 SEC LEXIS 2459, at *1-*58, *reprinted in* 2 J.A. 677-701.

In his petition for review to this court, Siegel's principal argument is that, because the SEC failed to properly assess the "cause" of the losses suffered by the Landrys and Downers, the agency's decision to uphold NASD's awards of restitution was an abuse of discretion. We agree. NASD General Principle No. 5, which the SEC purported to apply in this case, describes restitution as a "traditional remedy used to restore the status quo ante where a victim otherwise would unjustly suffer loss"; and it states that restitution may be ordered when a party "has suffered a quantifiable loss as a result of a respondent's misconduct." General Principle No. 5, FINRA Sanction Guidelines at 4 ("Principle 5"). The SEC completely failed to articulate any meaningful standards governing the level of causation required under Principle 5.

This case involves wealthy and sophisticated customers who were under no press of time to decide whether to invest; customers who invested specifically in furtherance of a desire to speculate; and a broker who did not profit from his wrongdoing and who has been fined and suspended for his violations. There is nothing in the SEC's decision to indicate why, in these circumstances, awards of restitution are appropriate under Principle 5. Indeed, the SEC's decision is incomprehensible insofar as it attempts to amplify any meaningful causal connection between Siegel's putative bad acts and the Downers' and Landrys' losses. And the SEC has cited no precedent, and we have found none, supporting restitution in a case of this sort. The SEC's judgment is fatally flawed for two reasons: First, the SEC's judgment is not supported by reasoned decisionmaking. Second, the SEC cites to no controlling precedent that includes reasoned decisionmaking supporting restitution under Principle 5 in a case of this sort. We therefore vacate the restitution order.

We reject Siegel's remaining challenges. Substantial evidence supports the SEC's findings that Siegel violated NASD's rules barring selling away and unsuitable recommendations. And the SEC did not abuse its discretion in imposing fines and consecutive six-month suspensions for Siegel's separate violations of Rules 3040/2110 and Rules 2310/2110.

## I. BACKGROUND

### A. *Siegel's Involvement in World ET*

Siegel has worked as a registered general securities representative since 1981. From October 24, 1997 to June 16, 1999, he was associated with Rauscher, a NASD member firm. In early 1997, before Siegel joined Rauscher, he had several conversations with representatives of World ET, where he learned of the company's burgeoning efforts to offer antibacterial services to the poultry and swine industries. World

ET representatives advised Siegel that the company was seeking to acquire the formula for a product called "Nok-Out" that could kill 99% of bacteria, fungi, and viruses on contact. In December 1997, World ET purchased the formula via a promissory note.

Siegel subsequently agreed to join World ET's board, to serve as a consultant to the company, and to help it raise the capital necessary to go public. On November 24, 1997, Siegel submitted a written request to Rauscher's compliance department for approval to sit on World ET's board. The department approved Siegel's request, but noted that Siegel would "not be able to effect transactions in securities of [World ET]" if the company went public. Inter-Office Memorandum from Jill Ivancevich, Compliance Department, Rauscher Pierce Refsnes, Inc., to Michael Siegel (Nov. 24, 1997), *reprinted in* 1 J.A. 283.

## B. *Siegel's Involvement with the Downers and the Landrys*

Siegel began managing investments for Huntington and Linda Downer in 1993. Huntington Downer was a prominent state legislator and former law firm partner, with experience in state budget and finance matters. Huntington Downer also had previously invested in speculative oil and gas ventures. The combined net worth of the Downers was between $1.5 million and $2 million. When Siegel joined Rauscher, the Downers transferred their holdings to a Rauscher account. Over time, the couple afforded Siegel significant discretion over their funds, providing him "complete authority" to do "what he wanted." Tr. of Hearing (Oct. 8-10, 2003), *reprinted in* 1 J.A. 49-50. The Downers acknowledged that they were "happy" with Siegel's representation. *Id.* at 50.

Siegel visited the Downers at their home in early 1997. The purpose of the meeting, according to Siegel, was to "bring them up to date" on the state of their investments. *Id.* at 188. The parties discussed personal matters, including Huntington

Downer's interest in running for governor and Siegel's new radio show on investing. They also discussed World ET, Siegel's application to serve on the company's board, and the Nok-Out product. Siegel gave the Downers a Nok-Out sample to use on their cat's litter box. At some point during this meeting, Huntington Downer expressed an interest in investing with World ET. Siegel advised the Downers that they could not invest until the company went public, but Huntington Downer pressed Siegel to contact the company and inquire about investment opportunities. Siegel subsequently spoke with World ET representatives, who informed him that the Downers could invest $300,000 in World IEQ Technologies, Inc. ("World IEQ"), a purported subsidiary of World ET. Siegel relayed this information to the Downers, who asked Siegel to obtain the documentation necessary for them to invest.

On November 24, 1997, Siegel visited the Downers again, this time bringing documents related to the proposed World IEQ investment. The paperwork included a "Subscription Agreement" and a "Subscriber Prospective Offeree Questionnaire." Siegel did not review these documents prior to delivering them. As he later testified, had he done so, he would have seen that the offering documents were deficient. Both documents referenced an investment in a debenture, which is an unsecured bond. Neither document, however, included any information on interest rates or repayment terms. Moreover, the two documents were inconsistent in the limited investment information they provided. Huntington Downer promptly signed and returned the documents, but Siegel still declined to review the paperwork. He did, however, fax the documents to World ET. Later, on December 1, 1997, Siegel transferred $300,300 from the Downers' Rauscher account to a World IEQ bank account after receiving written authorization from the Downers to do so.

Within two weeks, World ET contacted Siegel to notify him that the World IEQ investment was no longer viable and that the Downers could receive a refund of their initial investment or transfer it to World ET. When Siegel relayed this information to his clients, Huntington Downer sought Siegel's advice on how to proceed. In response to this inquiry, Siegel told Downer: "I would rather be in the mother company if I had a choice." *Id.* at 251. The Downers subsequently opted to invest in World ET. They never received or signed any new documentation concerning the investment.

\* \* \*

In November 1997, Dorothy and Barry Landry opened an account with Siegel at Rauscher. The Landrys had recently sold Ms. Landry's business and were looking to invest. They provided Siegel with $1 million in funds and afforded him significant independent investment discretion. In late 1997, Siegel met with the Landrys to complete the paperwork necessary to open their Rauscher account. At that meeting, Siegel raised the possibility of investing in World ET as "something [the Landrys] might be interested in" and that they should "take a look at." *Id.* at 123. The Landrys expressed interest, which Siegel relayed to World ET. Officials at World ET then sent along documentation for the Landrys to sign. Siegel delivered the offering documents to the Landrys, but he did not review them. As with the Downers, the documentation was deficient. The papers included a subscription agreement that described the purchase of one debenture "unit" at $100,000, but contained no maturity date for the debenture and no interest rate. World Environmental Technologies, Inc., Subscription Agreement, *reprinted in* 1 J.A. 313-15.

On Siegel's advice, the Landrys held onto the documents to review them over the next few months before making a final investment decision. On February 5, 1998, the Landrys directed Siegel to transfer $100,000 from their Rauscher account to their

joint bank account. Six days later, the Landrys gave the signed documents and a $100,000 check to Siegel, who sent both to World ET. World ET negotiated the check, but the Landrys never received any documentation confirming their investment.

World ET was never approved to be publicly traded. The company made its last payment on the Nok-Out promissory note in October 1998. On August 28, 2002, World ET lost its rights to Nok-Out. On February 13, 2004, the Texas Secretary of State revoked World ET's corporate charter.

Siegel's direct involvement with World ET included signing a resolution authorizing its acquisition of Nok-Out; loaning the company $22,000 on January 14, 1998; entering into an employment agreement on January 27, 1998 to raise a minimum of $15 million for World ET in exchange for cash and company shares; and making an additional loan to the company of $20,166.01 on March 6, 1998. Neither Siegel, the Downers, nor the Landrys ever received any payment from World ET.

## C.  *Disciplinary Proceedings Against Siegel*

Broker-dealers who trade in securities are subject to the regulations covering national securities associations. During the events relevant to this case, NASD was a registered national securities association and acted pursuant to quasi-governmental authority to oversee the activities of its members and associated persons. As we explained in *National Ass'n of Securities Dealers, Inc. v. SEC*, 431 F.3d 803 (D.C. Cir. 2005):

> Two provisions of the Exchange Act define NASD's quasi-governmental authority to adjudicate actions against members who are accused of unethical or illegal securities practices and the Commission's oversight of that authority. These are §§ 15A and 19. Section 15A, 15 U.S.C. § 78o-3, lays out the specific duties of a registered national securities association. It sets out disciplinary functions which NASD, as a registered national securities association, must

perform. . . . 15 U.S.C. § 78o-3(b)(6). Where NASD members have allegedly violated either association rules or federal securities law, NASD has the authority to consider disciplinary action in the first instance. *See* 15 U.S.C. § 78o-3(b)(7). If NASD proceeds against a member, it must provide a minimum level of process, including notice of the specific charges and an opportunity to be heard, as well as a statement of subsequent findings. *See* 15 U.S.C. § 78o-3(h). Fair disciplinary procedures are a prerequisite for registration of a national securities association. 15 U.S.C. § 78o-3(b)(8).

Given the statutory requirements of § 15A, NASD . . . established an elaborate adjudicative arm to address disciplinary actions. . . . Where a complaint has been filed against members for violations of federal securities laws, the adjudication may take place before a NASD Hearing Panel [in NASD's Office of Hearing Officers]. . . . As noted above, Hearing Panel [*i.e.*, OHO panel] decisions may be appealed to NAC, or they may be reviewed by NAC on its own initiative. . . .

Section 19, 15 U.S.C. § 78s, sets out the Commission's supervisory duties over all "self-regulatory organizations." NASD is a "self-regulatory organization" by virtue of the fact that it is a "registered securities association" under § 15A. *See* 15 U.S.C. § 78c(a)(26) (definition of "self-regulatory organization"). With respect to adjudications, the Commission's oversight begins with the obligation of self-regulatory organizations to notify the Commission of any final disciplinary sanction imposed on a member or associated person. 15 U.S.C. § 78s(d)(1). The statute also provides the Commission with plenary review powers. 15 U.S.C. § 78s(e). Once notified, the Commission may, on its own motion or on the application of any person aggrieved by the association's action, review

> NASD's disciplinary action. 15 U.S.C. § 78s(d)(2). . . . Section 19(e) authorizes the Commission to make an independent determination as to whether the violations found by the association occurred, and to change NASD's sanctions in whatever ways it deems appropriate. *See* 15 U.S.C. § 78s(e). The Commission may base its determination on the record compiled by the association, but it is not limited to that record and may adduce additional evidence.

*Id.* at 805-06.

On November 26, 2002, NASD's Department of Enforcement filed a complaint with NASD's OHO. The complaint alleged that Siegel violated NASD Conduct Rules 3040 and 2110 when he "sold away," *i.e.*, engaged in private securities transactions on behalf of his clients without providing prior written notice to Rauscher, and NASD Conduct Rules 2310 and 2110 when he recommended World ET to his clients without having any reasonable grounds for believing that his recommendations were suitable. Complaint ¶¶ 1-31, *In re Michael Frederick Siegel*, No. C05020055 (Nov. 25, 2002), *reprinted in* 1 J.A. 20-27.

> Rule 3040 states:

> Prior to participating in any private securities transaction, an associated person shall provide written notice to the member with which he is associated describing in detail the proposed transaction and the person's proposed role therein and stating whether he has received or may receive selling compensation in connection with the transaction . . . .

NASD Conduct Rule 3040, NASD Manual 3040(b). A "[p]rivate securities transaction" is defined as "any securities transaction outside the regular course or scope of an associated person's employment with a member." *Id.* 3040(e)(1).

Rule 2310 states:

> In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

NASD Conduct Rule 2310, NASD Manual 2310(a). As noted above, Siegel acknowledged that he did not review the offering documents before conveying the materials to the Downers and the Landrys.

Rule 2110 states:

> A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade.

NASD Conduct Rule 2110, NASD Manual 2110. "It is well settled that a violation of a . . . NASD rule or regulation also constitutes a violation of Conduct Rule 2110." *SEC Decision*, 2008 SEC LEXIS 2459, at *20 n.13, 2 J.A. 685 (citing *In re Stephen J. Gluckman*, Exchange Act Release No. 41,628 (July 20, 1999), 1999 SEC LEXIS 1395, at *22-*23).

After an initial hearing, the OHO panel found that Siegel violated Rule 2310, Rule 3040, and Rule 2110. *Initial OHO Decision*, 2 J.A. 463-79. The panel imposed sanctions, including a $20,000 fine with a six-month suspension for "selling away" (Rules 3040 and 2110), and a $10,000 fine with a separate six-month suspension for making unsuitable recommendations to the Downers and Landrys (Rules 2310 and 2110). *Id.* at J.A. 479. The panel allowed Siegel to serve his two suspensions concurrently and did not order him to pay restitution to the customers. Justifying the latter decision, the panel noted that the Downers and the Landrys were "relatively sophisticated persons,

who voluntarily chose to invest in a risky enterprise"; that "Siegel earned nothing from the transactions and lost his own money"; and that the customers were separately pursuing arbitration to recoup their losses. *Id.* at 478.

Siegel appealed to NAC. After initially remanding the case to the OHO panel to make certain credibility determinations and factual findings, *see Initial NAC Decision*, 2 J.A. 482-87, NAC affirmed the panel's initial findings with two modifications. *See Second NAC Decision*, 2 J.A. 497-521. First, NAC ordered Siegel to serve his suspensions consecutively rather than concurrently. *Id.* at 516-17. Second, NAC ordered Siegel to pay restitution in the amounts of $300,300 to the Downers and $100,000 to the Landrys, *less* any value the customers received from selling their securities, any residual value in the securities that the customers had not sold, and any restitution that the customers had recovered through other avenues. *Id*. at 519-20. The case was then referred to a NAC subcommittee to determine whether the restitution amounts should be reduced. *See id.* After receiving a recommendation from the subcommittee, NAC concluded that no offsets were required and ordered Siegel to pay 100% restitution to the victims – $300,300 to the Downers and $100,000 to the Landrys. *See NAC Supplemental Decision*, 2 J.A. 642-58.

Siegel appealed to the SEC, which affirmed NAC's liability and sanction determinations. *SEC Decision*, 2008 SEC LEXIS 2459, at \*1-\*58. On the Rule 2310 violation, the SEC grounded its analysis on the view that "'a broker may violate the suitability rule if he fails so fundamentally to comprehend the consequences of his own recommendation that such recommendation is unsuitable for any investor, regardless of'" individual characteristics. *Id.* at \*28, 2 J.A. 689 (quoting *In re F.J. Kaufman & Co.*, Exchange Act Release No. 27,535 (Dec. 13, 1989), 1989 SEC LEXIS 2376, at \*11). As noted above, Siegel acknowledged that he did not review the offering documents that

he conveyed to the Downers and the Landrys. The Commission focused on the flaws in those documents and on Siegel's concession that the deficiencies in the documents rendered an investment in World IEQ and World ET unsuitable for any investor. *Id.* at \*31, 2 J.A. 690. The Commission rested on these grounds, explicitly declining to address "whether World ET was suitable for the Downers and the Landrys based upon their personal situations." *Id.* at \*31 n.26, 2 J.A. 690.

On appeal to this court, Siegel contests his liability for having made a "recommendation" to the Downers, as well as each of the sanctions imposed by the SEC.

## II. ANALYSIS

### A. *Standard of Review*

The question of whether Siegel "recommended" an investment to the Downers under Rule 2310 is a "facts and circumstances" inquiry. *SEC Decision*, 2008 SEC LEXIS 2459, at \*21, 2 J.A. 686 (internal quotation marks and citation omitted). The SEC's findings of fact are reviewed under the "very deferential" substantial evidence standard, *see Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008) (internal quotation marks and citation omitted), and are conclusive if "a reasonable mind might accept [the] evidentiary record as adequate" to support the agency's conclusions. *Id.* (internal quotation marks and citation omitted); *see also* 15 U.S.C. § 78y(a)(4). Under this standard, the reviewing court must consider all relevant evidence; however, the court "'may not find substantial evidence merely on the basis of evidence which in and of itself justified [the agency's decision], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Morall v. DEA*, 412 F.3d 165, 177 (D.C. Cir. 2005) (quoting *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 962 (D.C. Cir. 2003) (internal quotation marks and citation omitted)). The reviewing court may

not substitute its own judgment for the agency's "choice between two fairly conflicting views," even if that court "would justifiably have made a different choice had the matter been before it *de novo*." *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

The SEC reviews sanctions imposed by the NASD to determine whether they "impose[] any burden on competition not necessary or appropriate" or are "excessive or oppressive." 15 U.S.C. § 78s(e)(2); *see also PAZ Sec., Inc. v. SEC*, 494 F.3d 1059, 1065-66 (D.C. Cir. 2007) ("*PAZ I*"). This court reviews the SEC's conclusions regarding sanctions to determine whether those conclusions are arbitrary, capricious, or an abuse of discretion. *See PAZ Sec., Inc. v. SEC*, 566 F.3d 1172, 1174 (D.C. Cir. 2009) ("*PAZ II*"). "The agency's choice of remedy is 'peculiarly a matter for administrative competence,' and we will reverse it 'only if the remedy chosen is unwarranted in law or is without justification in fact.'" *Id.* (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 112-13 (1946)).

**B.** ***Siegel's Liability for Violating Rule 2310 with Respect to the Downers***

In conducting its inquiry into whether Siegel recommended World ET investments to the Downers within the meaning of Conduct Rule 2310, the SEC properly considered the "'content, context, and presentation'" of Siegel's communications, and whether, as an objective matter, Siegel's communication "'reasonably could have been viewed as a call to action' and 'reasonably would influence an investor to trade a particular security or group of securities.'" *SEC Decision*, 2008 SEC LEXIS 2459, at \*21, 2 J.A. 686 (quoting NASD Notice to Members, 01-23 (Apr. 2001), 2001 NASD LEXIS 28, at \*8-\*9, \*19). In concluding that Siegel "recommended" World ET to the Downers, the SEC focused on a number of "main factors." *Id.* at \*22, 2 J.A. 686. These factors included the close relationship between the Downers and Siegel, the Downers' reliance on

Siegel for investment advice, the nature of the specific conversations between the Downers and Siegel regarding investments in World ET, and Siegel's initiation of conversations concerning World ET with the Downers. *Id.* at \*21-\*22, 2 J.A. 686-87. On the basis of this evidence, the SEC concluded that Siegel's "conduct constitute[d] a recommendation because it was a 'call to action' that reasonably influenced the Downers . . . to invest in World ET." *Id.* at \*24, 2 J.A. 687.

We have little doubt that the SEC's conclusion is supported by substantial evidence. Siegel contends that he specifically discouraged the Downers from investing and only acted as an intermediary with World ET at Huntington Downer's insistence. Pet. Br. at 49-50. The SEC noted, however, that "Siegel admit[ted] that he could have refused" this request. *SEC Decision*, 2008 SEC LEXIS 2459, at \*23, 2 J.A. 686. Siegel also contends that he declined to review the offering documents that he gave to the Downers in an attempt to avoid violating Rule 3040's prohibition against engaging in a private securities transaction without providing written notice to Rauscher, and Rule 2310's prohibition against unsuitable recommendations, and communicated as much to the Downers. *See* Pet. Br. at 51-52. But this explanation does not speak to the question of whether Siegel's communications with the Downers could be perceived by a reasonable person in the Downers' position as a "suggestion to invest" in World ET and, thus, raise the specter of a violation of Rule 2310.

More importantly, as the SEC found, following his initial conversations with the Downers, Siegel "encourag[ed the Downers] to invest in World ET after learning they could not invest" in the subsidiary company, World IEQ. *SEC Decision*, 2008 SEC LEXIS 2459, at \*25, 2 J.A. 687. As the agency notes, "[a]fter Siegel informed the Downers that it was no longer possible to invest in World IEQ, he advised them to invest in World ET rather than receive a refund on their World IEQ

investment, stating that he 'would rather be in the mother company if [he] had a choice.'" *Id.* at \*23, 2 J.A. 686. Siegel provides no explanation for how this statement can be interpreted as anything other than a suggestion to invest in World ET. This interaction alone is sufficient to sustain the SEC's finding that Siegel recommended an investment.

## C. *Mitigating Factors*

Siegel contends that the SEC failed to appropriately consider certain mitigating factors prior to imposing sanctions. His arguments are unpersuasive and warrant little attention here. The Government's brief on behalf of the SEC more than ably addresses this issue:

> Siegel argues that NASD's sanctions are "inappropriate" in light of allegedly mitigating factors "the SEC largely brushed aside." . . . [T]he Commission properly found that a number of Siegel's claims of mitigation were not supported in the record. The remaining claims fall into two categories: (1) those that could not be mitigating – even if they were present in the record; and (2) those that, although mitigating and present in the record, are outweighed by aggravating factors. . . .
>
> In the first category of claims are those that the Commission refused to credit because doing so would turn ignorance of regulatory requirements into excuses for misconduct or reward [for] simply complying with such requirements. Thus, for example, the Commission refused to excuse Siegel's Rule 3040 violations based on his purported "misunderstanding" of the rule. As the Commission held, that claim is "especially not mitigating because of [Siegel's] seventeen years of experience as an associated person . . . and the fact that he has been active as a registered investment advisor, authored a book on

investment advice, and served as a local media expert on financial topics."

In addition, the Commission refused to consider mitigating Siegel's assertions that he: had no disciplinary history; cooperated in NASD's investigation; never performed any act pursuant to the World ET employment agreement; did not attempt to create the impression that Rauscher sanctioned his activities; and did not recruit other registered individuals to sell World ET securities. Siegel also asserts as mitigating that World ET securities have not been found to involve a violation of the securities laws or rules. While these are factors listed in the guidelines as either general considerations applicable to all sanction determinations . . . or violation-specific considerations . . . not every consideration listed in the guidelines has the potential to be mitigating . . . .

Thus, as the Commission explained, the presence of any of the factors listed above could justify an increase in sanctions, but their absence is not mitigating "because an associated person should not be rewarded for acting in compliance with the securities laws and with his duties as a securities professional." . . .

Finally, Siegel does point to a number of factors that the Commission concluded had some mitigating impact: that his acts of misconduct were neither numerous nor made over an extended period of time; that a small number of customers were involved; that those customers were sophisticated; and that he disclosed that he was seeking an appointment to World ET's board. The Commission concluded, however, that the mitigating impact of these factors was outweighed by aggravating factors, particularly Siegel's reckless failure to take any steps to inform himself about the securities he recommended to his clients.

Gov't Br. at 35-37 (internal citations omitted).

The Government's discussion of this issue needs no amplification. It is sufficient to say that, on the record here, the SEC reasonably addressed mitigating and aggravating circumstances in considering sanctions. We reject Siegel's arguments to the contrary.

**D.** *Concurrent Versus Consecutive Suspensions*

This case represents the first time that the SEC has "addressed whether the imposition of consecutive – as opposed to concurrent – suspensions is excessive or oppressive." *SEC Decision*, 2008 SEC LEXIS 2459, at *46, 2 J.A. 696. As an initial matter, it is important to remember that the agency "may impose sanctions for a remedial purpose, but not for punishment." *McCurdy v. SEC*, 396 F.3d 1258, 1264 (D.C. Cir. 2005). Thus, the SEC must "review the sanction imposed by the NASD with 'due regard for the public interest and the protection of investors,'" *PAZ I*, 494 F.3d at 1065 (quoting 15 U.S.C. § 78s(e)(2)), and ensure that it "serve[s] a remedial purpose, as required by" the Exchange Act. *Id.* at 1061; *see also* 15 U.S.C. § 78s(e)(2). To justify a sanction as remedial, the agency "'must do more than say, in effect, petitioners are bad and must be punished.'" *PAZ I*, 494 F.3d at 1064 (quoting *Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099, 1113 (D.C. Cir. 1988)). The agency must, "at the least[,] . . . give '[s]ome explanation addressing the nature of the violation and the mitigating factors presented in the record.'" *Id.* at 1064-65 (quoting *McCarthy v. SEC*, 406 F.3d 179, 189-90 (2d Cir. 2005)). However, beyond "mak[ing] the necessary 'findings regarding the protective interests to be served' by expulsion," the agency need not "state why a lesser sanction would be insufficient." *PAZ II*, 566 F.3d at 1175-76 (quoting *McCarthy*, 406 F.3d at 189).

As the SEC noted, NASD's NAC concluded that "because . . . selling away and suitability violations involve different kinds

of misconduct and raise separate and serious regulatory concerns," consecutive suspensions would "specifically discourage all types of additional misconduct at issue." *See SEC Decision*, 2008 SEC LEXIS 2459, at \*44-\*45, 2 J.A. 695-96 (internal quotation marks and citation omitted). The SEC "agree[d] with NASD that Siegel's violations are different in nature and raise separate public interest concerns." *Id.* at \*46, 2 J.A. 696. Thus, the SEC imposed consecutive suspensions not to punish Siegel, but rather to protect the public from two fundamentally different types of harms.

As the agency noted, "[t]he purpose of NASD Conduct Rule 3040 is to protect 'investors from unsupervised sales and securities firms from exposure to loss and litigation from transactions by associated persons outside the scope of their employment.'" *Id.* (quoting *In re Chris Dinh Hartley*, Exchange Act Release No. 50,031 (July 16, 2004), 2004 SEC LEXIS 1507, at \*13 n.17). The SEC thus found that Siegel's suspension for the Rule 3040 violation "will protect the public interest by discouraging Siegel and others from selling away and from undermining the protections in place at firms." *Id.* The purpose of NASD Rule 2310, on the other hand, is "to protect customers from potentially abusive sales practices by ensuring that a registered representative has reasonable grounds for believing that his recommendation is suitable." *Id.* The SEC accordingly found that the separate suspension for the Rule 2310 violations "will protect the public interest by encouraging Siegel and others to take the steps necessary to determine that recommendations that they make to their customers are suitable while also deterring them from putting their own interests ahead of those of their customers." *Id.* at \*46-\*47, 2 J.A. 696-97. Given the deference due to the SEC, we cannot say that the agency abused its discretion in finding that consecutive, six-month suspensions were not excessive or oppressive.

Siegel contends that the SEC erred in focusing on his prior bad acts instead of on the current threat he poses to the investing public. Some cases have suggested that undue focus on past actions may raise doubts about the propriety of a sanction. *See, e.g.*, *Johnson v. SEC*, 87 F.3d 484, 490 (D.C. Cir. 1996). There is no rigid rule on this, however, because "[i]t is difficult to imagine how *any* suspension, remedial or not, could be based on anything but past actions." *McCurdy*, 396 F.3d at 1264.

Siegel also argues that, in imposing consecutive suspensions, the agency improperly relied on general deterrence, which is "essentially a rationale for punishment, not for remediation." *PAZ I*, 494 F.3d at 1066. We do not agree that the SEC erred in this way. This is not a case in which the SEC offered "no other rationale whatsoever" beyond general deterrence. *Id.* Furthermore, "'general deterrence . . . may be considered as part of the overall remedial inquiry.'" *Id.* (quoting *McCarthy*, 406 F.3d at 189); *see also McCarthy*, 406 F.3d at 189 ("[T]he SEC has expressly adopted deterrence, both specific and general, as a component in analyzing the remedial efficacy of sanctions.").

Finally, Siegel contends that his lack of a disciplinary record subsequent to the events of this case undermines the remedial efficacy of the suspensions. This argument was not raised before the agency, so we decline to consider it here. *See* 15 U.S.C. § 78y(c)(1).

In sum, we hold that the SEC did not abuse its discretion in upholding the consecutive suspensions imposed by NAC.

### E. *Restitution*

As noted above, Siegel's principal argument to this court is that, because the SEC failed to properly assess the "cause" of the losses suffered by the Landrys and Downers, the agency's decision to uphold NASD's awards of restitution was an abuse of discretion. There is merit to this claim.

In ordering Siegel to pay restitution in excess of $400,000, in addition to paying fines and serving consecutive suspensions, both the NASD's NAC and the SEC relied on Principle 5 in NASD's Sanction Guidelines. *See Second NAC Decision*, 2 J.A. 518-19; *SEC Decision*, 2008 SEC LEXIS 2459, at \*48-\*52, 2 J.A. 697-99. Principle 5 states, in relevant part:

> Where appropriate to remediate misconduct, Adjudicators should order restitution and/or rescission. Restitution is a traditional remedy used to restore the status quo ante where a victim otherwise would unjustly suffer loss. Adjudicators may determine that restitution is an appropriate sanction where necessary to remediate misconduct. *Adjudicators may order restitution when an identifiable person, member firm[,] or other party has suffered a quantifiable loss as a result of a respondent's misconduct, particularly where a respondent has benefitted from the misconduct.*

> Adjudicators should calculate orders of restitution based on the actual amount of the loss sustained by a person . . . as demonstrated by the evidence. Orders of restitution may exceed the amount of the respondent's ill-gotten gain. Restitution orders must include a description of the Adjudicator's method of calculation.

Principle 5, at 4 (emphasis added).

Counsel for both parties before this court agreed that, under Principle 5, the SEC must demonstrate a causal connection between a broker's misconduct and any loss at issue. In other words, Siegel cannot be made to pay restitution to the Downers or the Landrys unless the SEC shows that Siegel's misdeeds caused their investment losses. What is unclear, however, is the level of causation that is required before the agency may impose restitution.

There are several ways in which to construe the causation requirement of Principle 5. One possibility would be to find that

Principle 5 requires nothing more than loose, "but for" causation. Under this standard, the agency would be required to determine whether a loss would not have occurred but for the broker's misconduct. As we noted in *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004), "but for" causation is an unwieldy concept:

> "But for" causation may be restrictive in some circumstances . . . . *See* PROSSER & KEETON ON THE LAW OF TORTS 66-67 (5th ed. 1984). Often, however, it is viewed as an expansive theory. *See, e.g.*, *Pryor v. American President Lines*, 520 F.2d 974, 978 n.4 (4th Cir. 1975) (describing "but for" causation as a potentially "limitless" standard under which "Eve's trespass caused all our woe" (citing 2 HARPER & JAMES, THE LAW OF TORTS 1108 (1956))); *see generally* PROSSER & KEETON, at 266 (noting that the breadth of "but for" causation may depend on whether it is employed as a rule of inclusion or exclusion).

*Id.* at 1127 n.2. Recognizing that "but for" causation may indeed be "limitless" in assessing whether restitution is due for broker-dealer violations, the SEC's counsel conceded at oral argument that Principle 5 requires more than a showing of "but for" causation in order to justify restitution.

Another possibility is "proximate causation," which is normally understood to require a *direct relation* between conduct alleged and injury asserted. *See, e.g.*, *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268-69 (1992). It is noteworthy that, in its decision ordering Siegel to pay restitution, NAC appears to assume the applicability of "proximate cause" as the test required by Principle 5. *See Second NAC Decision*, 2 J.A. 519 (inquiring whether "Siegel's violative conduct ever ceased to be the proximate cause of the customers' losses").

Yet another possibility is a "substantial factor" test of causation. This test is sometimes applied when a contested loss

has "been brought about by two or more concurrent causes." *Daniels v. Hadley Mem'l Hosp.*, 566 F.2d 749, 757 (D.C. Cir. 1977). Under such a test, the agency would be required to show that a broker's violation of NASD rules was a "'substantial factor' in bringing about the harm" to his clients. *Id.*

Last but not least is "loss causation," best exemplified by the court's decision in *Bastian v. Petren Resources Corp.*, 892 F.2d 680 (7th Cir. 1990). In *Bastian*, the plaintiffs invested $600,000 in oil and gas limited partnerships promoted by the defendants. The plaintiffs, who were fully intent on investing in oil and gas companies, alleged that without the defendants' misrepresentations and misleading omissions, they would not have made these particular investments, which were "worthless" by 1984 because the entire oil and gas market collapsed in the early 1980s. *Id.* at 682, 684-85. The court noted:

> The plaintiffs alleged that they invested in the defendants' limited partnerships because of the defendants' misrepresentations, and that their investment was wiped out. But they suggest no reason *why* the investment was wiped out. They have alleged the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to be a losing one. . . .
>
> . . . .
>
> If the plaintiffs would have lost their investment regardless of the fraud, any award of damages to them would be a windfall. . . .

*Id*. at 684-85. The court in *Bastian* held that plaintiffs had not sufficiently pled loss causation because they "were not told that oil and gas partnerships are risk-free. They knew they were assuming a risk that oil prices might drop unexpectedly. . . . [and were] unwilling to try to prove that anything beyond the materializing of that risk caused their loss." *Id.* at 686.

Siegel argued to the SEC and to this court that "loss causation" is the level of causation that is required before the agency may impose restitution pursuant to Principle 5. Siegel points out that the Downers and the Landrys purposefully intended to pursue speculative investments in World ET. According to Siegel, the customers lost their investments because of World ET's failure, not because of Siegel's failure to review the deficient offering documents. In response to Siegel's insistence that principles of "loss causation" should be followed in this case, the SEC rejected the reasoning of *Bastian* as inapposite, because that case involved "a private action for damages under the antifraud provisions of the federal securities laws where 'loss causation' was an element of the claim." *SEC Decision*, 2008 SEC LEXIS 2459, at *49, 2 J.A. 697.

We do not mean to suggest that the foregoing tests of causation are always clear or mutually exclusive. They are not. Nor do we mean to suggest that we have exhausted all possible tests of causation in pondering the meaning of Principle 5. And we certainly do not mean to suggest that we know which test of causation offers that best construction of Principle 5. We do not. What we do mean to show, however, is that – apart from strict liability and limitless notions of "but for" causation – there are a number of ways in which Principle 5 might be construed. This responsibility belongs to the SEC, not this court. Unfortunately, the SEC has offered virtually nothing to explain the applicable test of causation under Principle 5.

As noted above, Principle 5 sets forth a causation requirement in the following terms: "Adjudicators may order restitution when *an identifiable person, member firm[,] or other party has suffered a quantifiable loss as a result of a respondent's misconduct . . . .*" Principle 5, at 4 (emphasis added). In footnote 55 of its opinion, the SEC offered the following explanation of this causation requirement:

> In requiring that a loss be <u>a</u> result rather than <u>the</u> result of a respondent's misconduct, we acknowledge that other factors may bear upon the loss and that any determination as to the propriety of restitution will be based on an analysis of all the relevant facts and circumstances.

*SEC Decision*, 2008 SEC LEXIS 2459, at *51 n.55, 2 J.A. 698 (underscoring in original). "[T]his explanation is nonsense, and the two [phrases] together are not even compatibly nonsensical." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 376 (1998). Whether a loss is the sole result or one of many results of a broker's misconduct is irrelevant to the causation issue raised by Siegel. Moreover, the second part of footnote 55 does not even reflect an acknowledgment by the Commission that Principle 5 requires some meaningful causal connection between a broker's misconduct and the losses suffered by his clients. Rather, in footnote 55, the Commission does no more than assert that it will decide whether to impose restitution on the basis of "an analysis of all the relevant facts and circumstances." *SEC Decision*, 2008 SEC LEXIS 2459, at *51 n.55, 2 J.A. 698. This explanation tells neither the reviewing court nor the regulated parties anything about (1) the degree of causal connection that the Commission will require between proven misconduct and a loss before imposing 100% restitution, or (2) how the Commission intends to measure the substantiality of that connection. This is entirely unacceptable. As the Court noted in *Allentown Mack*, "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." 522 U.S. at 374.

The SEC based its decision on the proposition that "as between Siegel's customers, who were placed in unsuitable investments and Siegel, who recommended them, equity requires Siegel, as the person responsible for the losses, to bear the burden and to return the customers to the position occupied prior

to the unsuitable recommendations." *SEC Decision*, 2008 SEC LEXIS 2459, at \*50, 2 J.A. 698. The agency's own analysis, however, makes clear that the unsuitability of the recommendations stemmed not from a level of risk associated with the investments that the customers were otherwise unwilling to bear, but rather from the terms of the investment offering documents, which were deficient. Tellingly, there is nothing in the SEC decision demonstrating that the customers' losses came "as a result of" these document deficiencies. Indeed, had the investment paperwork that Siegel provided to his clients not been deficient, the Downers and the Landrys still would have suffered the same losses once World ET failed. Moreover, in resting its analysis on the deficient offering documents, the SEC declined to address "whether World ET was suitable for the Downers and the Landrys based upon their personal situations." *Id.* at \*31 n.26, 2 J.A. 690.

In failing to articulate a comprehensible principle governing the level of causation required by Principle 5, the SEC decision borders on whimsical or rests on notions of strict liability. In either event, the decision offers no reasonable construction of the causation requirement under Principle 5. This is far short of reasoned decisionmaking. As the Supreme Court has explained, the "evil of a decision" of this sort is that it "prevent[s] both consistent application of the law by subordinate agency personnel . . . and effective review of the law by the courts." *Allentown Mack*, 522 U.S. at 375. The SEC's decision in this case clearly fails for want of reasoned decisionmaking.

\* \* \*

Although not supported by reasoned decisionmaking, the SEC's judgment on restitution arguably might survive review if supported by controlling precedent that included reasoned decisionmaking. However, the SEC has cited no such precedent, and we have found none, supporting restitution under Principle 5 in a case of this sort.

As noted above, this case involves wealthy and sophisticated customers who were not pressed to decide whether to invest; customers who invested in furtherance of their specific desires to speculate in a high risk venture; and a broker who did not profit from his wrongdoing and who has been fined and suspended for his violations. The SEC has never ordered restitution in a situation such as this. Indeed, all of the cases cited by the SEC indicate that restitution has been ordered only in situations in which causation is clear, *i.e.*, there has been proof that the amount charged in restitution is closely and inextricably tied to the amount lost as a result of the broker's wrongdoing.

During oral argument, SEC counsel was asked to cite the case that best supports the SEC position in this case. Counsel cited *In re Dane S. Faber,* Exchange Act Release No. 49,216 (Feb. 10, 2004), 2004 SEC LEXIS 277, a decision not relied upon by the SEC. The case involved restitution sanctions in a situation in which the agency found fraudulent and unsuitable recommendations in violation of SEC Rule 10b-5 and NASD rules. The agency found that the broker-dealer had "recommended that a financially inexperienced customer of modest means preparing for retirement invest nearly all of her portfolio (which constituted more than two-thirds of her total liquid assets) in a single speculative security *despite her instructions that she wanted conservative investments*." *Id*. at *28 (emphasis added). *Faber* obviously gives no support to the SEC's judgment in this case.

The SEC decision cites to three cases: *In re Toney L. Reed*, Exchange Act Release No. 33,676 (Feb. 24, 1994), 1994 SEC LEXIS 507 (*"Reed I"*); *In re Toney L. Reed*, Exchange Act Release No. 34-37,572 (Aug. 14, 1996), 1996 SEC LEXIS 2208 ("*Reed II*"); and *In re David J. Dambro*, Exchange Act Release No. 32,487 (June 18, 1993), 1993 SEC LEXIS 1521. These cases do not support the SEC's judgment in this case.

The *Reed* cases involved a broker-dealer whose company charged excessive markups to his customers when selling securities. The NASD ordered Reed, the president and general securities principal of a securities firm, to pay restitution to customers to cover the value of the excessive markups in the sale of securities. Reed contested restitution on the grounds that he could not be ordered to "disgorge" profits that NASD had not proved he actually possessed, an argument the agency rejected. The SEC's decision in the *Reed* cases surely does not support its decision in this case. *Reed* compares restitution with disgorgement, but it does not speak to the causation part of the restitution inquiry. While *Reed* clarifies that "an order for restitution can seek to restore the customer's position by returning the amount by which the customer was deprived," the SEC also makes it clear that restitution is appropriate only insofar as "equity would demand that the wrongdoer, rather than the customer, bear the loss." *Reed I*, 1994 SEC LEXIS 507, at *13. The losses suffered by Reed's clients were attributable solely to Reed's impermissible price markups. As the SEC noted, "it is equitable to require [Reed] to compensate those he injured by his pricing determinations" because Reed was the president and a significant owner of the firm and was also "the individual who was involved actively in both the purchase of the stock for the Firm and the resale of that stock to the Firm's customers at excessive prices." *Reed II*, 1996 SEC LEXIS 2208, at *4. The agency also noted that Reed had notice of this potential outcome, because the NASD Guidelines specify that in a markup case, "consideration should be given to requiring restitution to customers of the excess amount of the markup." *Id.*

The SEC's decision in *Dambro* is similarly inapposite. In that case, a broker-dealer used an aggressive, "cold call" approach to contact an elderly retiree, and in that single call recommended the purchase of 670,000 shares of a highly speculative stock. The retiree had a net worth of about $400,000 and an annual income of around $50,000. The SEC noted that,

"[d]espite the high level of risk to which [the retiree's] $10,000 would be subject, Dambro made only a cursory inquiry into whether such an undertaking accorded with [the retiree's] objectives." *Dambro*, 1993 SEC LEXIS 1521, at *7. The agency also agreed with NASD that "the sale of a highly speculative security which had exhibited little evidence of profit potential to a person of advanced age is inherently suspect." *Id.* at *11 (internal quotation marks and citation omitted).

The situation faced by the Downers and the Landrys bears little resemblance to the scenarios in these cases. In the *Reed* cases, the customers' losses were the direct result of impermissible markups, and restitution was imposed against the president and general securities principal of the firm. In *Dambro* and *Faber*, the losses resulted from speculative, high-risk investments that were pressed on customers for whom such investments obviously were inappropriate. In this case, the losses resulted when World ET – a high risk, start-up company – failed. But the unsuitability of Siegel's recommendations stemmed from inadequate documentation, not the nature of the company itself. The SEC did not find that World ET was unsuitable for the Downers and the Landrys based upon their personal situations.

Moreover, the Downers and the Landrys themselves bear little resemblance to the victims in the cases cited by the SEC. There is no evidence that the customers in the *Reed* cases knowingly put themselves in a position to be swindled by a broker who charged excessive markups. In *Dambro*, the customer lost money in a highly speculative investment that was pressed upon him by an aggressive broker who made no assessment of the customer's risk tolerance. In *Faber*, the speculative investment was recommended despite the customer's explicit aversion to risk. By comparison, the Downers were looking to speculate and obviously understood they could lose their money if World ET failed. Indeed, Huntington Downer

indicated that he was aware of the speculative nature of his investment; and he conceded that he had "not heard of investments paying" at the rate suggested by Siegel for the World ET and World IEQ investments "unless all of the sudden you hit it lucky." NASD Arbitration Tr. (Apr. 14, 2004), *reprinted in* 2 J.A. 600. The Landrys testified that Siegel "did not pressure them to invest." *SEC Decision*, 2008 SEC LEXIS 2459, at \*12, 2 J.A. 682. And Dorothy Landry acknowledged that, in her mind, the World ET investment "was just as much of a gamble as if I had taken it to the gulf coast and put it down on a slot machine"; she added that, "if I was to take 10 percent of my money and go to the casino, I would have just as much chance of bringing some home as I'm going to have as I give it to this thing." NASD Arbitration Tr. (Apr. 13, 2004), *reprinted in* 2 J.A 603. In response to these damning admissions, the SEC merely says, "[e]ven where a customer seeks to engage in a highly speculative investment, a registered representative has a duty to refrain from making unsuitable recommendations." *SEC Decision*, 2008 SEC LEXIS 2459, at \*53, 2 J.A. 699. While that may be true, it speaks only to the question of liability; it does not relieve the agency of its obligation to show a meaningful causal relationship between the amount ordered to be paid in "restitution" (as distinguished from fines) and sanctionable wrongdoing.

In this case, sophisticated investors willingly sought to invest their money in a highly speculative venture involving a start-up company that eventually failed. The SEC has cited no controlling precedent that includes reasoned decisionmaking supporting restitution under Principle 5 in a case of this sort. We therefore vacate the restitution order. The SEC's failure to coherently analyze the extent to which the losses were truly a result of Siegel's misconduct is an abuse of discretion.

### III.  CONCLUSION

The petition for review is denied in part and granted in part. We deny Siegel's challenges to the SEC's finding that he violated Rule 2310 with respect to his dealings with the Downers.  We also deny Siegel's challenges to the fines and consecutive suspensions imposed by NAC and upheld by the SEC in connection with his violations of Rules 3040, 2310, and 2110. We grant Siegel's petition for review challenging the SEC order upholding NAC's imposition of restitution.  For the reasons given in this opinion, we find that the  SEC's judgment awarding full restitution was neither adequately explained in its decision nor supported by agency precedent.  We therefore vacate the restitution order.  The case is remanded to the agency for a prompt disposition of this matter consistent with this opinion.