# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 9, 2013           Decided June 11, 2013

No. 10-1195

JOHN M.E. SAAD,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

On Petition for Review of an Order of
the Securities & Exchange Commission

*Steven N. Ber*k argued the cause for petitioner. With him on the briefs was *Matthew J. Bonness*. *Michael S. Gulland* entered an appearance.

*Christopher Paik*, Special Counsel, Securities and Exchange Commission, argued the cause for respondent. With him on the brief were *Michael A. Conley*, Deputy General Counsel, and *John W. Avery*, Deputy Solicitor.

Before: HENDERSON and ROGERS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This case involves a disciplinary action brought against John M.E. Saad by the

Financial Industry Regulatory Authority, Inc. ("FINRA"), which is the successor to the National Association of Securities Dealers ("NASD"). From January 2000 to October 2006, Saad was a regional director in the Atlanta, Georgia, office of Penn Mutual Life Insurance Company ("Penn Mutual"). He was also registered with Penn Mutual's broker-dealer affiliate, Hornor, Townsend & Kent, Inc. ("HTK"), which is a FINRA-member firm. In September 2007, FINRA filed a complaint with its Office of Hearing Officers charging that, in July 2006, Saad had violated FINRA rules by submitting false expense reports for reimbursement for nonexistent business travel and for a fraudulently purchased cellular telephone. After a hearing, the Hearing Panel found that Saad had violated NASD Conduct Rule 2110 and sanctioned him with a permanent bar against his association with a member firm in any capacity. This sanction was affirmed by FINRA's National Adjudicatory Counsel ("NAC") and by the U.S. Securities and Exchange Commission ("SEC" or "Commission").

In his petition for review to this court, Saad does not contest his culpability, but instead argues only that the SEC abused its discretion in upholding the lifetime bar. In reviewing a disciplinary sanction imposed by FINRA, the SEC must determine whether, with "due regard for the public interest and the protection of investors," that sanction "is excessive or oppressive." 15 U.S.C. § 78s(e)(2). As part of that review, the SEC must carefully consider whether there are any aggravating or mitigating factors that are relevant to the agency's determination of an appropriate sanction. *See PAZ Sec., Inc. v. SEC*, 494 F.3d 1059, 1065 (D.C. Cir. 2007) ("PAZ I"). This review is particularly important when the respondent faces a lifetime bar, which is "the securities industry equivalent of capital punishment." *Id.*

Saad has consistently advanced a number of mitigating factors that he claims should militate against a lifetime bar. The SEC addressed several of these factors and chose not to credit them. However, the agency plainly ignored two important considerations: (1) the extreme personal and professional stress that Saad was under at the time of his transgressions; and (2) the fact that Saad's misconduct resulted in his termination *before* FINRA initiated disciplinary proceedings. The latter consideration is particularly significant because it is specifically listed in FINRA's Sanction Guidelines as a potential mitigating factor. SANCTION GUIDELINES 7 (2011) *available at* http://www.finra.org. In light of this record, we agree with Saad that the SEC abused its discretion in failing to adequately address all of the potentially mitigating factors that the agency should have considered when it determined the appropriate sanction. We take no position on the proper outcome of this case. That is for the SEC to consider in the first instance, after it has assessed all potentially mitigating factors that might militate against a lifetime bar. We therefore remand to the SEC for further consideration of its sanction in light of this opinion.

## I. Background

### A. Regulatory Overview

FINRA is an association of securities broker-dealers registered with the Commission pursuant to Section 15A(a) of the Securities Exchange Act of 1934. 15 U.S.C. § 78o-3(a). It is a self-regulatory organization empowered to adopt rules governing the conduct of its members and of persons associated with its members, such as Saad. FINRA enforces compliance with the Securities Exchange Act, SEC regulations, and FINRA's own rules. *See id.* § 78o-3(b)(2). FINRA does so by bringing disciplinary proceedings to adjudicate violations, which are subject to review by the

Commission. FINRA brought such a proceeding against Saad based on his conduct in 2006 and 2007.

During 2006 and much of 2007, Saad's activities as a securities dealer were subject to regulation by the NASD. However, by the time Saad's disciplinary proceeding was formally initiated in September 2007, the SEC had approved the consolidation of NASD with certain functions of the New York Stock Exchange to create a new self-regulatory organization: FINRA. Thus, while Saad's misconduct occurred prior to the creation of FINRA, FINRA's Department of Enforcement with the FINRA Office of Hearing Officers initiated proceedings against Saad.

Generally, the references to NASD and FINRA are interchangeable throughout this opinion. The charge against Saad was for a violation of NASD Conduct Rule 2110, which requires that members "observe high standards of commercial honor and just and equitable principles of trade." *See John M.E. Saad*, S.E.C. Release No. 62178, 2010 WL 2111287, at *4 (May 26, 2010). NASD Conduct Rule 2110 is comparable to the current, superseding FINRA Conduct Rule 2010. *See* NASD TO FINRA CONVERSION CHART SPREADSHEET, *available at* http://www.finra.org. In sanctioning Saad, FINRA and the SEC applied the FINRA Sanction Guidelines, as opposed to the predecessor NASD Sanction Guidelines. *See Saad*, 2010 WL 2111287, at *4.

**B. Facts**

The facts in this case are undisputed. Br. of Pet'r at 17. At the relevant time, Saad was employed by Penn Mutual and registered with its broker-dealer affiliate HTK, a FINRA-member firm. Saad was registered as an investment company products and variable contracts limited representative, a general securities representative, and a general securities principal.

This case centers on Saad's submission of several false expense claims to his employer and Saad's subsequent attempts to conceal his misconduct. In July 2006, when a scheduled business trip from his home base in Atlanta to Memphis, Tennessee, was cancelled, instead of staying home, Saad checked into an Atlanta hotel for two days. He later submitted to his employer a false expense report claiming expenses for air travel to Memphis and a two-day hotel stay in that city. Saad forged an airline travel receipt and a Memphis hotel receipt and attached those receipts to his expense report. Saad also submitted another false expense claim, unrelated to the fictional Memphis trip. He claimed an expense for the replacement of his business cellular telephone when in fact he had not replaced his own telephone but rather had purchased a telephone for an insurance agent who was employed at another firm. Saad testified at the disciplinary hearing that his employer probably would not have approved his purchase of a cell phone if he had submitted an accurate expense claim. *See Saad*, 2010 WL 2111287, at \*2.

At his disciplinary hearing, Saad also explained that this conduct occurred during a period when he was under a great deal of professional and personal stress. Toward the end of 2005, Saad's sales declined and he virtually halted business travel, which was considered a significant aspect of his professional responsibilities. In June 2006, Saad's superiors at Penn Mutual issued a production warning to him and admonished him to increase his sales of Penn Mutual products. During this same time period, Saad and his wife were caring for one-year old twins, one of whom had undergone surgery and was frequently hospitalized for a significant stomach disorder.

Saad's false travel expense report was discovered by the Atlanta office administrator, who noticed that Saad had attached to the report an unaltered receipt for four drinks

purchased at an Atlanta hotel lounge on the same day when, according to the expense report, Saad was supposed to be in Memphis. When the office administrator questioned him about the receipt for the drinks, Saad withdrew the receipt and threw it away. The office administrator retrieved the receipt from the trash and submitted it to Penn Mutual's home office, thus alerting Saad's employer to the falsity of the travel expense report. In September 2006, Saad was discharged by both Penn Mutual and HTK for his misdeeds.

## C. Proceedings Below

Approximately two months after Saad was terminated, NASD investigators questioned him about the reasons for his discharge and his false expense reports. During this investigation, Saad repeatedly attempted to mislead NASD by providing investigators with false information. In a November 2006 email, Saad told NASD that the expenses claimed on the fabricated trip report were "for a business trip that had yet to occur," although in fact the expenses were for a trip that had been cancelled and had not been rescheduled. *Saad*, 2010 WL 2111287, at *3. In April 2007, Saad misrepresented to a FINRA examiner that he did not know the person for whom he had purchased a cell phone. *Id.* And in testimony delivered in May 2007, Saad contended that he could not recall whether he had purchased a plane ticket for the July 2006 trip to Memphis. *John M. Saad*, Compl. No. 2006006705601, 9 (NAC Oct. 6, 2009) ("NAC Decision"), *reprinted in* Deferred Joint Appendix ("D.A.") 206, 214.

FINRA brought a disciplinary proceeding against Saad in September 2007, alleging "Conversion of Funds" in violation of NASD Conduct Rule 2110. A disciplinary hearing before a FINRA Hearing Panel was held in April 2008. The Hearing Panel found that Saad had deliberately deceived his employer both with regard to the travel report and the cell phone purchase; that this deception constituted conversion of his

employer's funds; and that this misconduct violated NASD Conduct Rule 2110. The Hearing Panel assessed costs against Saad and imposed a permanent bar against his association with a member firm in any capacity, noting that "according to the *FINRA Sanction Guidelines*, a bar is standard for conversion regardless of the amount converted." *John M.E. Saad*, Compl. No. 2006006705601, 8 (Office of Hr'g Officers Aug. 19, 2008), *reprinted in* D.A. 189, 196.

Saad appealed to the NAC, which affirmed the Hearing Panel. However, the NAC characterized Saad's actions as "misappropriation" of his employer's funds, not "conversion." The NAC found that there were no mitigating factors and that there were a number of aggravating factors, including "the intentional and ongoing nature of Saad's misconduct, Saad's efforts to deceive HTK and Penn Mutual, [and] Saad's initial instinct to conceal the extent of his actions from state and FINRA examiners." NAC Decision at 10, *reprinted in* D.A. 215. Because there is no specific sanction guideline for misappropriation, the NAC applied the guideline for conversion or improper use of funds and found that a permanent bar was an appropriate sanction.

On its review, the Commission agreed that Saad, by intentionally falsifying receipts, submitting a fraudulent expense report, and accepting reimbursement to which he was not entitled, had misappropriated his employer's funds in violation of NASD Conduct Rule 2110. The Commission found that Saad's dishonesty with his employer "reflect[ed] negatively on both Saad's ability to comply with regulatory requirements and his ability to handle other people's money." *Saad*, 2010 WL 2111287, at *5. The Commission also rejected Saad's claims that the sanction against him, a permanent bar, was improper because (a) there were inconsistencies between the sanction here and FINRA sanctions in other cases; (b) FINRA had employed the wrong

sanction guideline; (c) there were mitigating circumstances; and (d) the sanction was unduly punitive rather than remedial in nature. Instead, the Commission found that the sanction was appropriate because it was not "excessive or oppressive." 15 U.S.C. § 78s(e)(2).

With regard to the contention that there were inconsistencies between the sanction here and the sanctions applied in other cases, the Commission stated that "[i]t is well established . . . that the appropriateness of a sanction depends on the facts and circumstances of each particular case and cannot be precisely determined by comparison with action taken in other proceedings." *Saad*, 2010 WL 2111287, at *6. Likewise, the Commission declined to credit Saad's argument that FINRA applied the wrong provisions of its Sanction Guidelines, noting, *inter alia*, that the Guidelines "merely provide a starting point in the determination of remedial sanctions." *Id.*

The Commission also rejected Saad's claim that there existed circumstances sufficient to mitigate Saad's misconduct, noting that the Hearing Panel and the NAC had addressed and specifically rejected many of Saad's mitigation claims, including the claims that his misconduct was a one-time lapse in judgment, that he had an otherwise clean disciplinary history, and that his wrongdoing did not involve customer funds or securities. *See Saad*, 2010 WL 2111287, at *7. With respect to the allegedly "aberrant" nature of Saad's conduct, the SEC explained that its focus was less on the short time period during which the expense reports were submitted, than on Saad's "ongoing and intentional charade in support of which he fabricated documents." *Id.* The SEC referred to the NAC decision, which recounts Saad's conduct in submitting the expense reports in July 2006 and then repeatedly misleading investigators over the course of several months. *Id.* (citing NAC Decision at 9, *reprinted in* D.A. 214).

The SEC refused to be swayed by Saad's years of honest service because, the SEC explained, "an otherwise clean disciplinary history [is] not mitigating." *Id.* (citing *Daniel D. Manoff*, S.E.C. Release No. 46708, 2002 WL 31769236, at *5 (Oct. 23, 2002)). The SEC also referenced the NAC's discussion of this factor, which explained that a violator "should not be rewarded because he may have previously acted appropriately as a registered person." *Id.* (citing D.A. 213).

The SEC additionally declined to credit Saad's argument that his conduct did not affect customers. The SEC relied on FINRA's conclusion that "[a]lthough Saad's wrongdoing in this instance did not involve customer funds or securities, Saad's willingness to lie . . . and obtain funds to which he was not entitled indicates a troubling disregard for fundamental ethical principles which, on other occasions, may manifest itself in a customer-related or securities-related transaction." *Id.* The SEC decision then cited cases in which the Commission rejected assertions by respondents who sought mitigation because their wrongful conduct had not directly targeted customers. *See id.* at *7 n.30 (collecting cases).

The Commission further found that the sanction imposed had a remedial purpose that served the public interest. The Commission explained that a lifetime bar was warranted to protect customers from any future misconduct by Saad. *See id.* at *7-8. The Commission believed that Saad's conduct "raises serious doubts about his fitness to work in the securities industry, a business that is rife with opportunities for abuse." *Id.* at *8. His actions "reveal a willingness to construct false documents and then lie about them," all of which "suggests that his continued participation in the securities industry poses an unwarranted risk to the investing public." *Id.* The SEC also believed that his behavior, particularly his repeated efforts to conceal his misconduct,

"provides no assurance he will not repeat his violations." *Id.* The Commission also briefly explained that Saad's punishment was intended "as a deterrent to others in the securities industry who might engage in similar misconduct." *Id.*

## II. Analysis

### A. Standard of Review

"The SEC reviews sanctions imposed by the NASD to determine whether they 'impose[] any burden on competition not necessary or appropriate' or are 'excessive or oppressive.'" *Siegel v. SEC*, 592 F.3d 147, 155 (D.C. Cir. 2010) (quoting 15 U.S.C. § 78s(e)(2)); *see also PAZ I*, 494 F.3d at 1065-66. "This court reviews the SEC's conclusions regarding sanctions to determine whether those conclusions are arbitrary, capricious, or an abuse of discretion." *Siegel*, 592 F.3d at 155; *see also PAZ Sec., Inc. v. SEC*, 566 F.3d 1172, 1174 (D.C. Cir. 2009) ("PAZ II"). "The agency's choice of remedy is peculiarly a matter for administrative competence, and we will reverse it only if the remedy chosen is unwarranted in law or is without justification in fact." *Siegel*, 592 F.3d at 155. Nevertheless, this court is bound to reverse an administrative action if the agency has "entirely failed to consider an important aspect of the problem" or has "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374-75 (1998) (discussing the importance of "reasoned decisionmaking" in the review of agency adjudications).

**B. The Sanction Guidelines**

Saad argues that the SEC erred when it sustained a lifetime bar from the securities industry predicated on an application of the wrong FINRA sanction guideline. FINRA's most recent Sanction Guidelines were issued in 2006 "for use by the various bodies adjudicating disciplinary decisions . . . in determining appropriate remedial sanctions." SANCTION GUIDELINES 1 (2011), *available at* http://www.finra.org. The Guidelines include specific provisions covering conversion or improper use of funds or securities and for forgery and/or falsification of records. The former contains two prongs: one for conversion, which advises adjudicators to "[b]ar the respondent regardless of amount converted," and one for improper use, which advises them to "[c]onsider a bar." *Id.* at 36. The guideline for forgery and/or falsification advises adjudicators to "consider" a bar in "egregious cases." *Id.* at 37.

Saad claims that the SEC improperly applied the guideline for conversion or improper use, rather than the guideline for forgery and/or falsification. Saad contends that the SEC's reliance on the guideline for conversion or improper use was inappropriate for two reasons. First he argues that, because the SEC found him guilty of misappropriation, the guideline's conversion prong was inapposite. Second, he argues that the guideline's improper use prong applies only to the misuse of *customer* funds, not an employer's funds. Therefore, Saad continues, the Commission should have considered only the guideline for forgery and/or falsification, pursuant to which a lifetime bar would be inappropriate. Saad's arguments are unpersuasive.

The SEC did not err when it upheld a sanction pursuant to the guideline for conversion or improper use. The FINRA Sanction Guidelines do not purport to "prescribe fixed sanctions for particular violations." *Id.* at 1. "Rather, they

provide direction for Adjudicators in imposing sanctions consistently and fairly." *Id.* The Guidelines do not enumerate sanctions for every conceivable securities-industry violation; they merely address sanctions for "some typical securities-industry violations." *Id.* The SEC's decision correctly notes that the Guidelines "are not intended to be absolute" and, "[f]or violations that are not addressed specifically, Adjudicators are encouraged to look to the guidelines for analogous violations." *Saad*, 2010 WL 2111287, at \*6 (quoting SANCTION GUIDELINES 1). The SEC reasonably concluded that "misappropriation is doubtless analogous to conversion." Br. of SEC at 19. Because the Guidelines do not list a particular sanction for misappropriation, it was not arbitrary and capricious for the Commission to analogize to the guideline's conversion prong in this way. This is wholly consistent with the SEC's repeatedly stated view that the Guidelines do not specify required sanctions but "merely provide a 'starting point' in the determination of remedial sanctions." *Saad*, 2010 WL 2111287, at \*6 & n.23 (quoting *Hattier, Sandford & Reynoir*, S.E.C. Release No. 39543, 1998 WL 7454, at \*4 n.17 (Jan. 13, 1998)), *aff'd*, 163 F.3d 1356 (5th Cir. 1998).

Saad is similarly unpersuasive in his assertion that the guideline's improper use prong only applies to the misuse of customer funds – and thus would not apply to Saad's misconduct which involved claiming fraudulent reimbursements from his employer. The guideline for conversion and improper use refers to several FINRA and NASD rules, including FINRA Conduct Rule 2010 (the successor to NASD Conduct Rule 2110 at issue here). *See* SANCTION GUIDELINES 36. Saad points out that, "[w]ith the exception of FINRA Rule 2010 . . . each of the referenced rules concerns the improper use of (and potentially the conversion of) *customers'* funds or securities." Br. of Pet'r at 25. This assertion obviously does not advance Saad's position

because it acknowledges that FINRA Conduct Rule 2010 is not limited to misconduct relating to customer funds. Although Saad's briefing on this point is far from clear, he seems to make a sort of *in pari materia* argument that, in light of the other rules referenced, the SEC was required to import the "customers' funds" limitation into FINRA Conduct Rule 2010. The argument is patently flawed, and Saad cites no authority to support his claim. We therefore reject it.

Even if we were to accept Saad's argument that the SEC should have applied the guideline for forgery and/or falsification, that error by itself would not require a reversal or remand. The Commission reasonably concluded that "FINRA's decision to impose a bar is consistent with either guideline." *Saad*, 2010 WL 2111287, at *7. Indeed, both guidelines suggest that FINRA at least consider a bar. *See* SANCTION GUIDELINES 36-37. Saad objects because the guideline for conversion or improper use "*emphasizes* a permanent bar, while the sanction guideline for Forgery and/or Falsification *emphasizes* suspension." Br. of Pet'r at 23 (emphasis added). But the fact remains – as the SEC correctly noted – both guidelines expressly contemplate the possibility of a lifetime bar. Given the deference that we owe to SEC sanction decisions, *see Siegel*, 592 F.3d at 155, we decline to disturb the SEC's decision on this basis.

## C. The Lifetime Bar

Saad also argues that the Commission abused its discretion when it affirmed FINRA's imposition of a lifetime bar. He contends that the SEC failed to consider certain mitigating factors and to articulate a remedial rather than punitive purpose for the sanction. As a result, in Saad's view, the SEC erred by upholding a sanction that was "excessive or oppressive." 15 U.S.C. § 78s(e)(2). The Commission responds that it considered all of the necessary factors and reasonably concluded that a lifetime bar was appropriate under the

circumstances. For reasons described below, we agree with Saad that the Commission abused its discretion in failing to address several potentially mitigating factors.

Under 15 U.S.C. § 78s(e)(2), the Commission reviews a disciplinary sanction imposed by FINRA to determine whether, "having due regard for the public interest and the protection of investors," that sanction "is excessive or oppressive." *See also PAZ I*, 494 F.3d at 1064 (SEC reviews NASD sanctions *de novo*). In our review of SEC actions, "[w]e do not limit the discretion of the Commission to choose an appropriate sanction so long as its choice meets the statutory requirements that a sanction be remedial and not 'excessive or oppressive.'" *PAZ II*, 566 F.3d at 1176. The SEC's burden is to provide a convincing explanation of its rationale in light of the governing law. As we explained in *PAZ I*:

> When evaluating whether a sanction imposed by [FINRA] is excessive or oppressive, as we have stated before, the Commission must do more than say, in effect, petitioners are bad and must be punished; at the least it must give some explanation addressing the nature of the violation and the mitigating factors presented in the record. The Commission must be particularly careful to address potentially mitigating factors before it affirms an order . . . barring an individual from associating with a[] . . . member firm – the securities industry equivalent of capital punishment.

494 F.3d at 1064-65 (citations omitted).

Furthermore, the Commission may approve "expulsion not as a penalty but as a means of protecting investors . . . . The purpose of the order [must be] remedial, not penal." *Id.* at 1065. If the Commission upholds a sanction as remedial, it must explain its reasoning in so doing; "as the circumstances

in a case suggesting that a sanction is excessive and inappropriately punitive become more evident, the Commission must provide a more detailed explanation linking the sanction imposed to those circumstances." *Id.* at 1065-66. That is not to say, however, that the Commission is under any obligation to explain why it found a lesser sanction inappropriate. *See Siegel*, 592 F.3d at 157 ("[B]eyond mak[ing] the necessary findings regarding the protective interests to be served by expulsion, the agency need not state why a lesser sanction would be insufficient.").

After careful review of the record before us, we conclude that the case must be remanded for further consideration by the SEC. Remand is warranted because the decision of the Commission – as well as those of the FINRA Hearing Panel and the NAC – ignores several potentially mitigating factors asserted by Saad and supported by evidence in the record. We have previously cautioned that the SEC "must be particularly careful to address potentially mitigating factors" before affirming a permanent bar. *PAZ I*, 494 F.3d at 1065. The SEC has failed to do so in this case. In particular, Saad correctly notes that FINRA and the SEC failed to consider that "Mr. Saad's firm, HTK[,] disciplined him by terminating his employment in September of 2006, prior to regulatory detection." Br. of Pet'r at 34; *see also* Reply Br. at 12-13. Under the FINRA Sanction Guidelines, number fourteen of the "Principal Considerations in Determining Sanctions" is "[w]hether the member firm with which an individual respondent is/was associated disciplined the respondent for the same misconduct at issue prior to regulatory detection." SANCTION GUIDELINES 7. The SEC's decision acknowledges this argument: "[Saad] claims FINRA also failed to consider that HTK had fired him before FINRA detected his misconduct . . . ." *Saad*, 2010 WL 2111287, at \*7. However, the SEC's decision says nothing more regarding this issue, nor do the decisions issued by the Hearing Panel and the

NAC. When questioned about this point at oral argument, SEC counsel mistakenly argued that the termination was "irrelevant" because it occurred after the violation. *See* Oral Arg. at 19:45 - 23:40. The Guidelines say otherwise.

Similarly, the SEC's decision noted, but did not address, Saad's argument that "he was under severe stress with a hospitalized infant and a stressful job environment." *Saad*, 2010 WL 2111287, at \*7. The Guidelines do not expressly mention personal stress as a mitigating factor, but they are by their own terms "illustrative, not exhaustive; as appropriate, Adjudicators should consider case-specific factors in addition to those listed." SANCTION GUIDELINES 6.

In response to Saad's argument that the SEC ignored these potentially mitigating factors, the Commission weakly responds that it "implicitly denied that they were [mitigating] when it stated that it denied all arguments that were inconsistent with the views expressed in the decision." Br. of SEC at 24. This contention is not an acceptable explanation for the SEC's failure to provide "reasoned decisionmaking" in support of a lifetime bar. *See Allentown Mack*, 522 U.S. at 374-75.

When we explained in *PAZ I* that the SEC "must be particularly careful to address potentially mitigating factors," we meant that the Commission should carefully and thoughtfully address each potentially mitigating factor supported by the record. The Commission cannot use a blanket statement to disregard potentially mitigating factors – especially those, like an employee's termination, that are specifically enumerated in FINRA's own Sanction Guidelines. Because the SEC failed to address potentially mitigating factors with support in the record, it abused its discretion by "fail[ing] to consider an important aspect of the problem." *See State Farm*, 463 U.S. at 43. We must remand on that basis.

We take no position on the proper outcome of this case. We leave it to the Commission in the first instance to fully address *all* potentially mitigating factors that might militate against a lifetime bar.

## III.  Conclusion

The petition for review is granted. The case is remanded to the Commission for further consideration consistent with this opinion.