Concurring opinion filed by Circuit Judge Kavanaugh. Dubitante opinion filed by Circuit Judge Millett with respect to Section II.B of the opinion. MILLETT; Circuit Judge: ■ John M.E. Saad, a broker-dealer, unlaw-. fully misappropriated his employer’s funds on two separate occasions, and then spent the next seven months misleading investigators in an effort to cover up his wrongdoing. After a lengthy review process, the Securities and Exchange Commission sustained a decision of the Financial Industry Regulatory Authority (“FINRA”) permanently barring Saad from membership and from.working with any of its affiliated members. Saad challenges the- Commission’s decision as insufficiently attentive to mitigating factors and argues,that the permanent bar is impermissibly punitive rather than remedial. We hold that the Commission reasonably grounded its decision in the record, which extensively evidenced Saad’s acts of misappropriation, his prolonged efforts to cover his tracks through falsehoods, and his repeated and deliberate obstruction of investigators. With respect to the permanent bar on Saad’s registration with FINRA and affiliation with its members, the court remands for the Commission to determine in the first instance whether Kokesh v. SEC, — U.S. —, 137 S.Ct. 1635, 198 L.Ed.2d 86 (2017), has any bearing on Saad’s case. Accordingly, Saad’s petition for review is denied in part and remanded to the Commission in part. I A FINRA is a private self-regulatory organization that oversees the securities industry, including broker-dealers. Saad v. SEC, 718 F.3d 904, 907 (D.C. Cir. 2013); see Public Investors Arbitration Bar Ass’n v. SEC, 771 F.3d 1, 2 (D.C. Cir. 2014). As part of its industry oversight, FINRA sets professional rules of conduct for its members. See Saad, 718 F.3d at 907; see also 15 U.S.C. § 78o-3(b)(2); One such rule— FINRA Rule 2010—requires “[a] member, in the conduct of its business, [to] observe high standards of commercial honor and just and equitable principles of trade.” Financial Industry Regulatory Authority, FINRA Manual, FINRA Rules, Rule 2010.[1] The high ethical standards enforced by Rule 2010 aré vital'because “customers and firms must be able to trust securities professionals with their money.” J.A. 111— 112. Trustworthiness and integrity thus are essential to the functioning of the securities industry. FINRA has developed “Sanction Guidelines,” which elaborate upon the contours of its rules of conduct. As relevant here, the Guidelines provide that conversion and the improper use of funds or securities will violate Rule 2010. J.A. 93. Conversion is defined as “an intentional and unauthorized taking of and/or exercise of ownership over property by one who neither owns the property nor is entitled to possess it.” Id. In cases of conversion,' the Sanction Guidelines provide that “a [lifetime] bar is standard,” “regardless of [the] amount converted.” Id. In determining the appropriate sanction to be imposed for a violation of its rules, FINRA’s Guidelines outline eight factors to be considered: (i) the need for the sanction to be remedial, to deter future misconduct, and to improve business standards in the securities industry, (ii) the violator’s status as a repeat or one-time violator, (iii) the appropriateness of the sanction for the specific misconduct, (iv) the need in a particular case either to aggregate or to sanction individually similar violations, (v) the appropriateness of restitution or rescission, (vi) the remediation needed to ensure the individual does not benefit from ill-gotten gains, (vii) the necessity of requali-fication before permitting continued participation in the securities industry, and (viii) the violator’s ability to pay any fine or restitution. J.A. 87-90. In addition to those general principles, FINRA adjudicators must consider any other 'mitigating or aggravating factors. J.A. 91. -FINRA’s Sanction Guidelines provide a non-exhaustive list of nineteen potential aggravating or mitigating factors, including whether the violator (i) accepts responsibility for the misconduct, (ii) took voluntary corrective action prior to detection, (iii) engaged in a pattern of misconduct, (iv) perpetrated the misconduct over an extended period of time, (v) attempted to conceal the misconduct, (vi) acted intentionally, or (vii) was already disciplined by the FINRA member firm. J.A. 91-92. The disciplinary process begins when FINRA’s Department of Enforcement or Department of Market Regulation files a complaint with the FINRA Office of Hearing Officers. FINRA Rule 9211. A panel of hearing officers then conducts a disciplinary proceeding, FINRA Rule 9213, and issues a final written decision addressing both liability and remedial sanctions, FIN-RA Rule 9268. Either FINRA or the violator may appeal to the National Adjudicatory Council, FINRA Rule 9311, which “may affirm, modify, reverse, increase, or reduce any sanction, or impose any other fitting sanction,” FINRA Rule 9349(a). The Council then provides a proposed decision to the FINRA Board. FINRA Rule 9349(c). If no Board member calls for review of the Council’s decision, it becomes final. Id. The violator may then seek review of FINRA’s decision by the Securities and Exchange Commission, FINRA Rule 9370, which superintends the disciplinary decisions of financial industry self-regulatory organizations like- FINRA, 15 U.S.C. § 78s(d)-(e). The Commission conducts its own review of the disciplinary action, and may modify, affirm, or set aside the sanction. Id. § 78s(e)(l)(A)-(B). The Commission will set a remedial order aside if the order “imposes any burden on competition not necessary or appropriate” to further the purposes of the Securities Exchange Act, or if the sanction “is excessive or oppressive.” Id. § 78s(e)(2). B 1 John Saad was a regional director in the Atlanta Office of Penn Mutual Life Insurance Company, and was a FINRA-regis-tered broker-dealer employed by Penn Mutual’s affiliate Hornor, Townsend, & Kent, Inc. Saad, 718 F.3d at 906. Hornor, Townsend, & Kent, Inc. is a FINRA member firm. Id. In July 2006, Saad scheduled a business trip from Atlanta, Georgia, to Memphis, Tennessee, but the trip was canceled at the last minute. Saad, 718 F.3d at 908; see also J.A. 107. Instead of going home to his wife and infant twins, Saad checked into an Atlanta hotel for two days. Saad, 718 F.3d at 908. Upon returning to his office, Saad submitted a false expense report for air travel to Memphis and a two-night stay in a Memphis hotel. Id. Attached to that false expense report were forged receipts for the fictitious airfare and hotel. Id. Unconnected to the fabricated Memphis trip, Saad submitted another false expense report to his firm for a replacement cellphone. Saad, 718 F.3d at 908. Contrary to his representation in the expense report, Saad did not replace his own cellphone but instead purchased the cellphone for a female insurance agent at another firm. Id.; see also J.A. 62. Saad’s misconduct was soon discovered by an administrator in the Atlanta office of his firm because Saad submitted for reimbursement a receipt for four drinks purchased at an Atlanta hotel lounge on the same date that he was supposedly in Memphis. Saad, 718 F.3d at 908. When the administrator confronted him with the receipt, Saad grabbed the receipt and threw it away. Id. The administrator retrieved the receipt and sent it to Penn Mutual’s home office. Id. In September 2006, Saad’s employment was terminated. Id. After Saad’s termination, investigators from the National Association of Securities Dealers (“NASD”)—FINRA’s predecessor—questioned him about the false expense reports. Saad, 718 F.3d at 908. In a November 2006 email, Saad falsely told investigators that the fabricated trip report was “for a business trip that had yet to occur[.]” Id. Five months later, in April 2007, Saad falsely stated to investigators that he did not know the person for whom he had purchased the cellphone. Id. The next month, Saad untruthfully told examiners that he could not remember if he had purchased a plane ticket for the fabricated Memphis trip. Id. In September 2007, FINRA brought a disciplinary proceeding against Saad alleging “Conversion of Funds” in violation of FINRA Rule 2010. Saad, 718 F.3d at 908.[2] The hearing panel found that Saad had violated Rule 2010. Saad, in his own defense, explained that he had been experiencing significant personal and professional stress at the time he submitted the false expense reports because his sales had declined and one of Saad’s one-year old twins was suffering from a stomach disorder that required frequent hospitalizations. Id. The hearing panel imposed a bar that permanently forbade Saad from associating with any FINRA member firm in any capacity. Id. at 909. Saad appealed, and the National Adjudicatory Council affirmed. Saad, 718 F.3d at 909. In reviewing the lifetime ban, the Council concluded that Saad’s misconduct involved several aggravating factors, such as “the intentional and ongoing nature of Saad’s misconduct, Saad’s efforts to deceive [Hornor, Townsend, & Kent] and Penn Mutual, [and] Saad’s initial instinct to conceal the extent of his actions from state and FINRA examiners.” Id. at 909 (second alteration in original and citation omitted). The Council further determined that no mitigating factors counseled a lesser sanction. Id. The Securities and Exchange Commission affirmed, holding that, on this record, FINRA’s sanction was not “excessive or oppressive.” Saad, 718 F.3d at 909. This court granted Saad’s petition for review in part. We upheld the Commission’s use of the Sanction Guideline governing conversion as a “starting point” for determining the appropriate sanction for Saad’s two acts of misappropriation. Saad, 718 F.3d at 911. We remanded only because the Commission’s analysis failed to address potentially mitigating factors, such as Saad’s termination by his employer and Saad’s personal and professional stress. Id. at 913. We left open the question whether the lifetime bar was an “excessive or oppressive” sanction, noting that the Commission had an obligation on remand to ensure its sanction was remedial rather than punitive. Id. 2 On remand, the Commission directed the National Adjudicatory Council to reconsider the imposition of the lifetime bar and, in particular, to address whether (i) a member firm’s discipline of a rule violator prior to regulatory detection is a mitigating factor for the alleged violator, the member firm, or both, J.A. 36; (ii) the mitigating effect, if any, of Saad’s termination prior to regulatory detection, J.A. 38; (iii) the. mitigating effect, if any, of Saad’s personal and professional stress, J.A. 39; (iv) any other mitigating considerations, J.A. 45; and (v) the appropriateness of the lifetime bar for Saad’s misconduct, J.Á. 49. The Council determined that (i) prior discipline by a member firm may be mitigating for an individual violator, J.A. 37-38; (ii) Saad’s termination prior to regulatory detection was not mitigating on this record, J.A. 39; (iii) neither Saad’s personal nor his professional stress was mitigating, J.A, 43-45; (iv) no other relevant mitigating factors existed in the case, J.A. 45-49; and (v) a permanent bar remained the appropriate remedy for Shad’s misconduct, J.A. 49-50. The Commission again affirmed. The Commission determined that Saad’s repeated attempts over the course of seven months to conceal his misconduct from his employer and to mislead regulatory investigators were aggravating factors that supported FINRA’s imposition of the permanent bar. J.A. 112. The Commission further concluded that the “ ‘collateral consequences’ of misconduct, including loss of employment, reputation, and income, [were] not mitigating” on the facts of this case because they provided “‘no guarantee of changed behavior’ and may not be enough to overcome [the Commission’s] concern that he * * * ‘poses a continuing danger to investors and other security industry participants (including would-be employers).’” J.A. 112-113 (quoting Denise M. Olson, Exchange Act Release No. 75838, 2016 WL 5172954, at *5 (Sept. 3, 2015)). The Commission also decided that, “under these circumstances,” Saad’s claims of professional and personal stress were not mitigating because his misconduct involved multiple instances of deliberate and deceptive conduct spread out over a long period of time, rather than a spontaneous or “unthinking” action triggered by stress and “later redressed.” J.A. 113. The Commission found no mitigating value in Saad’s arguments that his misconduct was “a series of blunders,” his misappropriation did not involve customer funds, and he had a clean disciplinary record before his misappropriation. J.A. 114. Finally, the Commission reasoned that a permanent bar was the appropriate remedy in Saad’s case because it “serves important deterrent objectives and reaffirms long-standing FINRA policy that such dishonesty by members or their associated persons will not be tolerated.” J.A. 115, Accordingly, the Commission affirmed the permanent bar finding it to be “remedial,, not punitive,” and “necessary to protect FINRA members, their customers, and other, securities industry participants^]” J.A. 115. II We defer to the Commission’s sanction decision if it is reasonable and reasonably explained, and will overturn it only if it is “arbitrary, capricious, or an abuse of discretion.” Saad, 718 F.3d at 910 (quoting Siegel v. SEC, 592 F.3d 147, 155 (D.C. Cir. 2010)). A This court’s prior decision remanded for the Commission to address Saad’s mitigating evidence. Saad, 718 F.3d at 913-914, Saad now contends that the Commission failed to give his mitigating evidence sufficient heed. We disagree. The Commission reasonably balanced the relevant mitigating and aggravating factors before determining that the gravity of Saad’s behavior warranted remedial action, First, with respect to the mitigating? relevance of Saad’s termination by his employer for ■ misconduct,, the ■ Commission recognized that a FINRA Sanction Guideline provides that disciplinary action prior to regulatory detection may be considered mitigating. J.A. 112-113 (noting FINRA Principal Consideration in Determining Sanctions #14). But the Commission explained that his termination carried little weight in this case because “Saad repeatedly used dishonest means to overcome personal and professional disappointments and obstacles, and to mislead his employer and regulators.” J.A. 113. Given those facts, the Commission reasonably concluded that “termination, while mitigating under certain circumstances, [did not] overcom[e] the threat [Saad] would pose to investors and other securities industry participants were he to return to the industry.” J.A. 113. Second, the Commission credited Saad’s claims of personal and professional stress. The Commission nevertheless found them to lack mitigating force in this case because Saad’s conduct was not a momentary or impulsive action driven .by stress, but instead involved “deceptive conduct de-monstrat[ing] a high degree of inteñtionality over a long period of time.” J.A. 113. The Commission found it particularly significant that (i) Saad had not discussed the professional setbacks he was undergoing with his firm or otherwise sought assistance; (ii) his deception required planning and research; and (iii) he “methodically forg[ed] hotel and airfare receipts that bore logos that he had copied from the internet.” J.A. 113. In addition, thé Commission stressed that Saad did not own up to his missteps when' the firm administrator confronted • him about the fabricated expense report', but instead tried to destroy the evidence and repeatedly misled investigators for at least seven more months. J.A. 114. On‘ top of that, Saad engaged in a second act of misappropriation by using firm-.funds to purchase a cellphone for a person who worked at another firm; J.A. 114. The Commission reasonably concluded that a pattern of such prolonged and repeated misbehavior could not be attributed to stress. J.A. 114. Third, the Commission fairly addressed Saad’s arguments that his misconduct did not involve the misappropriation of customer funds, and that he otherwise had a clean disciplinary record. J.A. 114. The Commission explained that it had not differentiated between' the source of mistreated funds in the past, upholding bars even though “the underlying dishonesty did not relate directly to customers.” J.A. 114; see also J.A, 114 n.24 (citing disciplinary proceedings involving misappropriation of non-customer funds). That makes sense. As the Commission previously has explained, it is the deception and fraud in the handling of others’ property that endangers -the integrity of the' securities industry, and that threat remains the same whether the .victim is a trusting employer or trusting client. See Richard Dale Grafman, Exchange Act Release No. 21648, 1985 WL 548687, at *2 (Jan. 14, 1985) (upholding a sanction even though the conduct did not involve public customers because “[t]he securities business presents- a great many opportunities for abuse and overreaching, and depends very heavily on the integrity of its participants”). The Commission further noted that it has “repeatedly held that a clean disciplinary record is.not mitigating.” J.A. 114; see also J.A. 114 n.25 (citing a disciplinary proceeding holding that the lack of a disciplinary history is not mitigating); J.A. 91 n.l (FINRA Sanction Guidelines manual, citing Rooms v. SEC, 444 F.3d 1208, 1214-1215 (10th Cir. 2006), for the proposition that disciplinary history can serve only as an aggravating factor and its absence cannot be mitigating). There is nothing unreasonable about the Commission concluding that individuals' in a .profession .that depends critically on public trust and honesty are already expected to have a clean record, so it is not something for which they get extra credit. See Rooms, 444 F.3d at 1214 (noting that the violator “was required to comply with NASD’s high standards of conduct at all times”); see also World Trade Fin. Corp., Exchange Act Release No. 66114, 2012 WL 32121, at *16 (Jan. 6, 2012) (“[F]irms and their associated persons should not be rewarded for acting in accordance with their duties.”). Accordingly, we hold that the Commission’s thoroughgoing decision directly addressed the mitigating evidence, as required by our prior remand order, and provided a careful and comprehensive analysis of Saad’s arguments seeking a reduction in his sanction. Its decision reasonably focused on the record of Saad’s prolonged pattern of falsehoods and deception, as well as the direct threat that his misconduct posed to customers’ and other participants’ faith in the integrity of the securities industry. B Saad also challenges the Commission’s affirmance of FINRA’s lifetime bar on his affiliation with FINRA and its members as impermissibly punitive. We remand that question to the Commission to address, in the first instance, the relevance—if any—of the Supreme Court’s recent decision in Kokesh v. SEC, — U.S. —, 137 S.Ct. 1635, 198 L.Ed.2d 86 (2017). Accordingly, Saad’s petition for review is denied in part and remanded to the Commission in part. So ordered. . http://finra.complinet.com/en/display/ display_main.html?rbid=2403&element_id= 607. . Saad was initially investigated for and charged with violating National Association of Securities Dealers Rule 2110. See Saad, 718 F.3d at 909. NASD Rule 2110 is identical to FINRA Rule 2010. Id. at 907; see also Financial Industry Regulatory Authority, FINRA Manual, NASD Rules, Rule 2110, http://finra. complinet.com/en/display/display_main.html? rbid=2403&elemenl_id=605 ("A member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade.”). At the time Saad's disciplinary proceeding was formally initiated in September '2007, the SEC had “approved the consolidation of NASD with certain functions of the New York Stock Exchange to create” FINRA. Saad, 718 F.3d at 907.