# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 24, 2020      Decided November 6, 2020

No. 19-1214

JOHN M.E. SAAD,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

———

On Petition for Review of an Order
of the Securities and Exchange Commission

———

*Sarah Levine* argued the cause for petitioner. With her on the briefs was *Alex Potapov*.

*Dina B. Mishra*, Senior Counsel, Securities and Exchange Commission, argued the cause for respondent. With her on the brief was *John W. Avery*, Deputy Solicitor. *Michael A. Conley*, Solicitor, entered an appearance.

Before: TATEL, PILLARD, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: John M.E. Saad, a broker-dealer, twice misappropriated his employer's funds. Following Saad's unsuccessful efforts to cover his tracks by falsifying an expense report, forging receipts, and misleading investigators, the Financial Industry Regulatory Authority (FINRA) permanently

barred him from membership and from associating with any FINRA member firm. The question presented here—the same question we previously remanded for the Securities and Exchange Commission to consider—is whether the Supreme Court's recent decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), "has any bearing on Saad's case." *Saad v. SEC* (*Saad II*), 873 F.3d 297, 299 (D.C. Cir. 2017). The Commission concluded that it does not, and we agree.

## I.

"FINRA is a private self-regulatory organization that oversees the securities industry, including broker-dealers." *Id.* "As part of its industry oversight, FINRA sets professional rules of conduct for its members." *Id.* FINRA Rule 2010 requires a "member, in the conduct of its business, [to] observe high standards of commercial honor and just and equitable principles of trade." FINRA's "Sanction Guidelines" provide that "conversion and the improper use of funds or securities" violate Rule 2010. *Saad II*, 873 F.3d at 299. FINRA's Guidelines set forth eight specific factors for determining the appropriate sanction for a violation of its rules and instruct adjudicators to consider any other mitigating or aggravating factors. *Id.*

Once a sanction becomes final following FINRA's internal disciplinary process, a violator may seek review by the Securities and Exchange Commission. *Id.* at 300 (citing FINRA Rule 9370; 15 U.S.C. § 78s(d)–(e)). The Commission may set a sanction aside if it "'imposes any burden on competition not necessary or appropriate' to further the purposes of the Securities Exchange Act, or if the sanction 'is excessive or oppressive.'" *Id.* (quoting 15 U.S.C. § 78s(e)(2)). The Exchange Act directs the Commission to give "due regard [to] the public interest and the protection of investors." 15 U.S.C. § 78s(e)(2). Our court has characterized those provisions as imposing, among other things, a "statutory requirement[] that a sanction be remedial," rather than a form of punishment. *PAZ*

*Securities, Inc. v. SEC*, 566 F.3d 1172, 1176 (D.C. Cir. 2009); *see also Siegel v. SEC*, 592 F.3d 147, 157 (D.C. Cir. 2010) ("As an initial matter, it is important to remember that the agency 'may impose sanctions for a remedial purpose, but not for punishment.'" (quoting *McCurdy v. SEC*, 396 F.3d 1258, 1264 (D.C. Cir. 2005))).

Petitioner Saad worked as a regional director in Penn Mutual Life Insurance Company's Atlanta office and was a FINRA-registered broker-dealer employed by Penn Mutual's affiliate Hornor, Townsend & Kent, Inc., a FINRA member firm. In July 2006, Saad scheduled a business trip from Atlanta to Memphis, but the trip was canceled at the last minute. He instead checked into an Atlanta hotel for two days and then submitted a false expense report to his employer for air travel to Memphis and a two-night stay in a Memphis hotel. He attached to his report forged receipts for the fictitious airfare and hotel stay. Unrelated to the fabricated Memphis trip, Saad sought reimbursement for a replacement cellphone. Contrary to his representation in the reimbursement request, he purchased that cellphone not for himself, but rather for an insurance agent at another firm.

An office administrator soon discovered Saad's misconduct when Saad submitted for reimbursement a receipt for four drinks purchased at an Atlanta hotel lounge on a day when he had supposedly been in Memphis. The administrator confronted Saad with the receipt, who took it back and threw it away. The administrator retrieved the receipt and sent it to Penn Mutual's home office. Penn Mutual then fired Saad.

FINRA's predecessor, the National Association of Securities Dealers (NASD), then investigated Saad. During that investigation, Saad repeatedly lied about his actions. In September 2007, FINRA brought a disciplinary proceeding against Saad for "conversion of funds" in violation of NASD Rule 2110 (now FINRA Rule 2010). The hearing panel found

that Saad had violated the rule and imposed a bar permanently forbidding him from associating with any FINRA member firm in any capacity.

The Commission sustained Saad's bar, concluding that FINRA's sanction was not "excessive or oppressive." Our court then granted in part Saad's petition for review and remanded for the Commission to consider certain potentially mitigating factors, such as Saad's termination and his personal and professional stress. *Saad v. SEC* (*Saad I*), 718 F.3d 904, 913–14 (D.C. Cir. 2013).

The Commission then returned the case to FINRA, which considered the mitigating factors and concluded that a permanent bar remained appropriate. The Commission again sustained the bar, and Saad again sought review here. Although concluding that the Commission "reasonably balanced the relevant mitigating and aggravating factors before determining that the gravity of Saad's behavior warranted remedial action," we nonetheless remanded for "the Commission to address, in the first instance, the relevance—if any—of the Supreme Court's recent decision in *Kokesh*" to the question whether Saad's bar was "impermissibly punitive." *Saad II*, 873 F.3d at 302–04. Judge Millett and then-Judge Kavanaugh each wrote separately to convey their differing views on that subject. On remand, the Commission concluded that *Kokesh* did not alter the propriety of Saad's bar, and this petition followed.

## II.

Before examining the extent of *Kokesh*'s impact in the Exchange Act context, we must first explain how this court has interpreted that Act's standard for reviewing FINRA sanctions. The Exchange Act provides that the Commission may set aside a sanction that is "excessive or oppressive." 15 U.S.C. § 78s(e)(2). We have generally read the statute as imposing two related requirements on FINRA's selection of appropriate relief: that it do so with "due regard for the public interest and

the protection of investors," 15 U.S.C. § 78s(e)(2), and that it avoid "excessive or oppressive" sanctions, *id.*, by acting "for a remedial purpose, [and] not for punishment." *Siegel*, 592 F.3d at 157 (internal quotation marks omitted); *see also PAZ*, 566 F.3d at 1176 ("We require the Commission to explain its reasoning in order to ensure it reviewed the sanction with 'due regard for the public interest and the protection of investors.' 15 U.S.C. § 78s(e)(2). We do not limit the discretion of the Commission to choose an appropriate sanction so long as its choice meets the statutory requirements that a sanction be remedial and not 'excessive or oppressive.' *Id.*").

On to *Kokesh*. There, the Supreme Court considered whether disgorgement imposed as a sanction for violating federal securities law is a "penalty" subject to 28 U.S.C. § 2462's five-year limitations period for an "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture." *Kokesh*, 137 S. Ct. at 1639 (internal quotation marks omitted). The Court defined a "penalty" as a "'punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offen[s]e against its laws.'" *Id.* at 1642 (alteration in original) (quoting *Huntington v. Attrill*, 146 U.S. 657, 667 (1892)). From that definition it derived two principles. "First, whether a sanction represents a penalty turns in part on whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual. . . . Second, a pecuniary sanction operates as a penalty only if it is sought for the purpose of punishment, and to deter others from offending in like manner—as opposed to compensating a victim for his loss." *Id.* (internal quotation marks omitted). Applying those principles, the Court concluded that "SEC disgorgement constitutes a penalty within the meaning of § 2462." *Id.* at 1643.

The Court gave three reasons for its conclusion. "First, SEC disgorgement is imposed by the courts as a consequence for violating . . . public laws"—that is, the wrong is one

"against the United States rather than an aggrieved individual." *Id.* "Second, SEC disgorgement is imposed for punitive purposes." *Id.* Disgorgement's primary purpose, the Court explained, is to deter violations of the securities laws, and deterrence is a punitive objective. *Id.* Third, "in many cases, SEC disgorgement is not compensatory," given that disgorged profits may be dispersed in part to the United States Treasury rather than solely to victims of the violator's wrongdoing. *Id.* at 1644. Summarizing, the Court observed that disgorgement "bears all the hallmarks of a penalty: It is imposed as a consequence of violating a public law and it is intended to deter, not to compensate." *Id.* The Court rejected the Commission's argument that disgorgement was "remedial" rather than a "penalty," stressing that disgorgement "cannot fairly be said *solely* to serve a remedial purpose." *Id.* at 1645 (internal quotation marks omitted).

Importantly, the Court also limited its holding's reach with a disclaimer: "Nothing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context[.] The sole question presented in this case is whether disgorgement, as applied in SEC enforcement actions, is subject to § 2462's limitations period." *Id.* at 1642 n.3.

Saad argues that *Kokesh* sets forth new, general principles for distinguishing "punitive" and "remedial" sanctions, and that it accordingly governs section 78s(e)(2)'s "excessive or oppressive" standard. Because we agree with the Commission that *Kokesh* does not reach that far, our discussion begins and ends with that dispute.

This is not our first opportunity to address how far the principles governing section 2462's "penalty" inquiry extend beyond the statute of limitations context. In *Johnson v. SEC*, 87 F.3d 484, 491–92 (D.C. Cir. 1996), we reviewed a professional

suspension and followed much the same approach later adopted in *Kokesh*, concluding that the suspension of a broker for inadequately supervising a subordinate who had stolen from customers' accounts was a "penalty" for section 2462 purposes. Professional suspensions, we explained, in contrast to remedies like restitution, "are not directed toward correcting or undoing the effects" of wrongdoing. *Id.* at 491. Significantly, however, we made clear that the section 2462 inquiry does not extend to all other contexts, distinguishing the separate question whether a license suspension constitutes "punishment in various *constitutional* contexts" and observing that in such cases "the main focus . . . [is] on whether the law imposing the sanctions has an overall remedial *purpose* of protecting the public (with the sanctions being the reasonable means of achieving that purpose)." *Id.*; *see also id.* at 491 n.11 ("It is clearly possible for a sanction to be 'remedial' in the sense that its purpose is to protect the public, yet not be 'remedial' because it imposes a punishment going beyond the harm inflicted by the defendant.").

Consistent with *Johnson*'s emphasis on the limited reach of the section 2462 inquiry, our subsequent cases make clear that a sanction may be "remedial" under section 78s(e)(2) even if it is aimed at protecting the public and not at correcting the effects of wrongdoing. In one case, concerning a lifetime bar against an NASD member's president for failing to respond to information requests, we held that the Commission had adequately justified the bar as "remedial" for section 78s(e)(2) purposes by offering "adequate reasons for holding the sanction[] [was] warranted to protect investors." *PAZ Securities*, 566 F.3d at 1175–76. In another case, we again explained that "[t]he Commission may impose sanctions for a remedial purpose, but not for punishment," and approved a one year suspension because its "purpose . . . was not to punish [the violator], but rather to protect the public from his demonstrated capacity for recklessness in the present, and presumably to encourage his more rigorous compliance . . . in the future."

*McCurdy*, 396 F.3d at 1264–65. And most recently, we approved the Commission's imposition of consecutive suspensions against a securities industry supervisor because they were imposed "not to punish [the supervisor], but rather to protect the public," and were therefore "remedial." *Siegel*, 592 F.3d at 158. Together, these cases stand for the proposition that, in this circuit, the section 2462 inquiry does not automatically extend to other legal contexts, and, in particular, that it does not apply to the Exchange Act provision at issue here. Saad, in effect, asks us to read *Kokesh* as impliedly overturning that line of precedent. "[T]his Court imposes a substantial burden on a party advocating the abandonment of an established precedent." *United States v. Burwell*, 690 F.3d 500, 515 (D.C. Cir. 2012). Saad's argument suggests at most only that the Supreme Court "might, in some future case, come to question our approach"—hardly enough for us to jettison our well-established prior decisions. *Id.*

But even that predictive inference stretches *Kokesh* too far. Indeed, more recent Supreme Court precedent confirms that *Kokesh* has no bearing on the Exchange Act. In *Liu v. SEC*, 140 S. Ct. 1936 (2020), the Court considered whether the Commission may seek disgorgement as equitable relief in a civil enforcement action, a question expressly reserved in *Kokesh*. *See Kokesh*, 137 S. Ct. at 1642 n.3. The Exchange Act authorizes the Commission to punish securities fraud in civil proceedings by pursuing "equitable relief," 15 U.S.C. § 78u(d)(5), which "historically excludes punitive sanctions," *Liu*, 140 S. Ct. at 1940. In *Liu*, the Court held that disgorgement, at least when limited to the wrongdoer's gains and returned to investors, nonetheless falls within equitable bounds. *See id.* at 1946–47. Notably, the Court did not find that the opposite result flowed from *Kokesh*'s broad statement that "[d]isgorgement, as it is applied in SEC enforcement proceedings, operates as a penalty under § 2462." *Kokesh*, 137 S. Ct. at 1645. Nor did it apply *Kokesh*'s framework for distinguishing remedial sanctions from punitive penalties.

Instead, it conducted a historical inquiry to determine whether disgorgement "falls into those categories of relief that were *typically* available in equity." *Liu*, 140 S. Ct. at 1942–46 (internal quotation marks omitted). That the Court declined to reflexively apply *Kokesh* and instead independently analyzed the meaning of "remedial" within the separate set of cases relevant to the statutory inquiry before it makes clear that we should proceed similarly here.

Reinforcing that conclusion, the statutory scheme at issue here differs significantly from the one in *Kokesh*. "*Kokesh* involved a different sanction (disgorgement), imposed under a different statute under an entirely different type of Commission proceeding, to enforce public law not industry professional standards, and involved markedly different remedial and protective implications for private industry and private investors." *Saad II*, 873 F.3d at 311 (Millett, J., dubitante in part). Those differences provide a compelling reason for distinguishing *Kokesh*, especially given the Court's emphasis on the narrowness of its holding. *See Kokesh*, 137 S. Ct. at 1642 n.3 ("The sole question presented in this case is whether disgorgement, as applied in SEC enforcement actions, is subject to § 2462's limitations period.").

A final point. In arguing that *Kokesh*, if applicable, would proscribe his sanction—a question we need not reach—Saad acknowledges that the Exchange Act expressly authorizes FINRA to impose bars and the Commission to review and sustain them. 15 U.S.C. §§ 78*o*-3(b)(7), (h)(3). Extending *Kokesh* to generally prohibit bars as unduly punitive would thus conflict with other portions of the Exchange Act. Given a readily available alternative reading, we should avoid adopting such an internally contradictory interpretation of a statute. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must . . . interpret [a] statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into a[] harmonious whole." (citations omitted) (internal quotation

marks omitted)). Seeking to avoid this tension, Saad argues that his approach would not proscribe all bars, but instead only require FINRA to first consider the magnitude of individual misconduct, rather than "'simply wave the "remedial card" and thereby evade meaningful judicial review of harsh sanctions.'" Pet'r's Br. 46–47 (quoting *Saad II*, 873 F.3d at 306 (Kavanaugh, J., concurring)). But the history of this very case demonstrates that no such "remedial card" exists. As we explained in remanding the Commission's initial decision for further explanation, "[i]f the Commission upholds a sanction as remedial, it must explain its reasoning in so doing," meaning, at a minimum, that it "should carefully and thoughtfully address each potentially mitigating factor supported by the record." *Saad I*, 718 F.3d at 913–14.

To sum up, then, "binding circuit precedent . . . establish[es] that the Commission may approve expulsion not as a penalty but as a means of protecting investors." *Saad II*, 873 F.3d at 310 (Millett, J., dubitante in part) (internal quotation marks omitted). That is precisely what the Commission did in this case. And because this court has already held that the Commission appropriately concluded that Saad's bar was not "excessive or oppressive" in any other respect, *see id.* at 302–04, that ends our inquiry.

### III.

For the foregoing reasons, the petition for review is denied.

*So ordered.*